STATE OF MAINE

KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-06-113
SKS - KEN-11/16/2006

JOHN DOE,

Plaintiff

v.

EVERT FOWLE, COL. CRAIG
POULIN, and EVERETT B.
FLANNERY, JR., in their
official capacities,

Defendants

DECISION ON MOTIONS
TO DISMISS

DONALD L. GARBRECHT
LAW LIBRARY

JAN 16 2007

This matter comes before the court on motions to dismiss filed collectively by defendants Fowle and Poulin and filed separately by defendant Flannery. Earlier in this litigation, the plaintiff requested a temporary restraining order to prevent the defendants from enforcing the Sex Offender Registration and Notification Act of 1999 ("SORNA") (34-A M.R.S.A. §§ 11201-11256). That request was denied because the plaintiff failed to demonstrate a likelihood of success on the merits. Despite a multi-faceted attack, the plaintiff still fails to convince the court on the merits. The court has considered as true all of the facts pled by the plaintiff. However, the defendants have convinced the court that they are entitled to dismissal of the plaintiff's claims as a matter of law.

## Background

With one exception that does not affect these motions,[1] the background set forth in the court's decision on the plaintiff's application for temporary restraining order is incorporated herein.

---

[1] The original discussion of background noted that plaintiff Doe had not yet registered under SORNA as of the date of that order, May 4, 2006. The court was informed by correspondence from counsel for the

## Discussion

In its May 4, 2006 order, this court stated that none of the leading cases appear to support the plaintiff's arguments, and that continues to be the case. A leading case in Maine is *State v. Haskell*, 2001 ME 154; 784 A.2d 4, in which the Supreme Judicial Court noted, "Sex offender registration and notification laws have been the subject of much litigation and have been overwhelmingly sustained as constitutional by the majority of courts, n.12, including the United States District Court for the District of Maine, *see Corbin v. Chitwood*, 145 F.Supp.2d 92, 99 (D.Me. 2001)." The footnote referenced in the quote sets forth a very extensive list of some of the cases, noting the variety of constitutional challenges which have failed in each case. Faced with this mountain of precedent against him, the plaintiff attempts to cast his arguments as uniquely different or that the courts are simply wrong.

## Discussion

As the moving parties, the defendants support the motions by addressing each of the counts in the plaintiff's complaint. The arguments begin by noting that SORNA has the presumption of constitutionality, having been duly enacted by the Maine Legislature. In the face of this presumption, the plaintiff has asserted several constitutional arguments.

First, the plaintiff argues that the registration requirement, at least as applied to him, violates constitutional requirements of Due Process in that he was not aware of his ultimate registration requirement at the time he entered his guilty plea. Plaintiff states that he is not challenging the statute on an *ex-post facto* basis, yet that is the usual vehicle for addressing this type of problem. Our Supreme Judicial Court has already indicated

---

State defendants that prior to oral argument on September 7, 2006, Doe had registered and was placed in the Registry. Since Doe's name could always be removed from the Registry if successful in this litigation, the fact of registration does not render the case moot.

that SORNA does not pose *ex-post facto* problems. *State v. Haskell*, 2001 ME 154, 784 A.2d 4. The Due Process argument falters because of the mistaken belief that the requirement of registration is part of a criminal punishment. On the contrary, it is clear from *Haskell* that there are legitimate non-punitive goals of SORNA which are collateral consequences of the plaintiff's conviction as a sex offender, and do not trigger Due Process issues.

Plaintiff's second constitutional argument is that the court should hold the statute void for vagueness. However, the court finds nothing particularly vague or complex about the statutory requirements. It is clear that the duty to register is initiated by a conviction for a sex offense, and the type of registration – 10 year versus lifetime – simply depends upon the specific statutory identification of the offense. The court finds no vagueness.

Next, plaintiff argues his right to a civil jury trial for determination of certain facts necessary to determine the category of the offense and to assess the plaintiff's risk of reoffending. Although the plaintiff correctly cites the Maine Constitution, Art. I, § 20, concerning the right to civil jury trials, the section is irrelevant because there is nothing for a jury to find under SORNA. The statute requires the court to make a determination of the classification of the offender – 10 years versus lifetime – but that determination is made solely on the basis of the section of the criminal statutes under which the offender was convicted. Determining the applicable statute is a legal determination particularly within the province of the court and is not an issue for the jury. Further, the Department of Corrections is required to conduct a risk assessment (34-A M.R.S.A. § 11253), but that assessment is for purposes other than determining whether a sex offender is required to register. As stated before, the sole trigger for applying the registration requirements is conviction of a sexual offense and the risk of recidivism is

irrelevant to this issue. Finally, to the extent that the sex offender has a right to a jury trial, it is the criminal trial which was held or waived prior to his conviction for the specific offense. Since the fact of conviction triggers the responsibility to register, no further trial is necessary.

Plaintiff's next constitutional argument is that the forced registration scheme with its two class registration requirements violates the plaintiff's right to constitutional Equal Protection since it is done without risk assessment. The difference between the classes depends on the seriousness of the crime. Those convicted of less serious crime have to register for 10 years; more serious, for the rest of their lives. There is a rational relationship between this differentiation and the legislative goal of protecting vulnerable individuals from convicted sex offenders. The Legislature could have concluded that an individual who commits a more serious sexual offense poses a greater risk of further offending, and therefore should be required to register for the longer period of time so that the public is more aware of the offender's presence. This is a rational and legitimate legislative conclusion sufficient to overcome any Equal Protection arguments.

Another constitutional argument by the plaintiff is that SORNA violates substantive due process in that it violates one of the plaintiff's protected liberty interests, the right to privacy. Maine Constitution, Art. I, § 1. Assuming that Article I, §1 does include such a privacy right, the question is whether that right constitutionally prevents public safety authorities from disseminating information concerning the whereabouts of convicted sexual offenders. The fact of the conviction is already within the well-recognized realm of public information. Adding identifying information to make the public safety purpose of the legislation effective does not breach any fundamental privacy right either, or if it does, it is necessary to protect public welfare.

A registration system which is limited to the offender's name and the bare fact of conviction of a sex offense would seriously hamper its effectiveness.

With regard to the plaintiff's argument that enforcement of the registration statute violates 42 U.S.C. § 1983 as a violation of the plaintiff's constitutional rights, the court concludes simply that no such constitutional violation has been proved. Furthermore, as the section 1983 argument applies to defendant Flannery, the Sheriff cannot be held liable as a county law enforcement official for enforcing a State law.

Finally, a few words about the plaintiff's argument that his claims are unique and matters of first impression. In support of this claim, the plaintiff points to the "coercive" effects he believes SORNA has. These effects include the payment of an annual fee and the disclosure of new information concerning address, employment and other personal identifying facts which go beyond the simple fact of conviction. While these are the statutory requirements, the court finds no constitutional violation here either. Payment of the fee is simply to help offset the public expense of the registration program, and virtually every Sex Offender Registry statute which has been upheld requires filing of similar information. As noted previously, the whole purpose of the program is to give convicted sex offenders a higher public recognition in the interest of improved public safety.

For the reasons stated above, the entry will be:

The defendants' motions to dismiss are GRANTED; the plaintiff's complaint is DISMISSED as a matter of law, with prejudice, for failure to state a claim upon which relief may be granted.

Dated: November __16__, 2006

S. Kirk Studstrup
Justice, Superior Court

JOHN DOE - PLAINTIFF

Attorney for: JOHN DOE
JAMES E MITCHELL - RETAINED 04/26/2006
MITCHELL & DAVIS
86 WINTHROP STREET
AUGUSTA ME 04330


vs
EVERT FOWLE - DEFENDANT
,
Attorney for: EVERT FOWLE
PAUL STERN - RETAINED
OFFICE OF THE ATTORNEY GENERAL
6 STATE HOUSE STATION
AUGUSTA ME 04333-0006

CRAIG POULIN - DEFENDANT
,
Attorney for: CRAIG POULIN
PAUL STERN - RETAINED
OFFICE OF THE ATTORNEY GENERAL
6 STATE HOUSE STATION
AUGUSTA ME 04333-0006

EVERETT FLANNERY - DEFENDANT
,
Attorney for: EVERETT FLANNERY
PETER MARCHESI - RETAINED
WHEELER & AREY PA
27 TEMPLE ST
PO BOX 376
WATERVILLE ME 04903-0376

Attorney for: EVERETT FLANNERY
CASSANDRA S SHAFFER - RETAINED
WHEELER & AREY PA
27 TEMPLE ST
PO BOX 376
WATERVILLE ME 04903-0376

SUPERIOR COURT
KENNEBEC, ss.
Docket No AUGSC-CV-2006-00113

**DOCKET RECORD**

Filing Document: COMPLAINT                    Minor Case Type: DECLARATORY JUDGMENT
Filing Date: 04/28/2006

## Docket Events:
04/28/2006 FILING DOCUMENT - COMPLAINT FILED ON 04/28/2006

04/28/2006 Party(s):  JOHN DOE
        ATTORNEY - RETAINED ENTERED ON 04/26/2006
        Plaintiff's Attorney: JAMES E MITCHELL

04/28/2006 CERTIFY/NOTIFICATION - CASE FILE NOTICE SENT ON 04/28/2006
        Plaintiff's Attorney:  JAMES E MITCHELL
        MAILED TO ATTY. OF RECORD

STATE OF MAINE
KENNEBEC, ss

SUPERIOR COURT
CV-06-113
_,)ULill - r-r il - -z/f?;/2o r r_

JOHN DOE et al.

**ORDER ON CROSS-
MOTIONS FOR
SUMMARY JUDGMENT**

v.

COL. ROBERT WILLIAMS, et al.[1]
In his capacity as
Chief of Maine State Police

Before the court is a motion for summary judgment brought on behalf of plaintiffs John
Doe I, III, IV, V, VI, VII, VIII, X, XIII, XVI, XVIII, XXIV, and XLIII, represented by the office
of Attorney Jim Mitchell, and joined by John Doe XIV, represented by Attorney Walt McKee,
and John Doe XIX and XXIII, represented by Attorney Ron Bourget. The plaintiffs' motion
challenges the constitutionality of 34-A M.R.S. §11201-11256 (2010), Maine's Sex Offender
Registration and Notification Act of 1999 (SORNA). The state defendants, represented by
Deputy Attorney General Paul Stern, Assistant Attorney General Laura Yustak-Smith, and
Assistant Attorney General Ron Lupton object to the motion and have cross-moved for summary
judgment upholding the constitutionality of the statute, as amended. In addition to the parties'
motions for summary judgment, the court also considers at this time the plaintiffs' motion for
attorneys' fees, the state defendants' objection, and the plaintiffs' response.

## CASE HISTORY AND BACKGROUND

The case was brought originally in 2006, and it has a complex history, both procedurally
and substantively. The initial complaint was filed on April 28, 2006 on behalf of John Doe I.
His complaint was dismissed by Justice Kirk Studstrup on November 16, 2006, for failure to
state a claim for which relief could be granted. On October 12, 2007, the Maine Supreme Court
vacated the dismissal in *Doe v. District Attorney,* 2007 ME 139, 932 A.2d 552, and remanded the
case to the Superior Court of Kennebec County for "further factual development." *Id.* at ¶ 1, 932
A.2d at 554. The case was assigned to Justice Nancy Mills on December 29, 2007, and
reassigned to the undersigned Justice on April 1, 2008. On July 14, 2008, a temporary

---

[1] Colonel Patrick Fleming was the original named defendant, but Colonel Robert Williams has succeeded him in the
post of Chief of the State Police. As the party is a defendant in his official, rather than individual, capacity, the court
has made the substitution after receiving the new information from the state defendants.

1

restraining order was issued on behalf of five other John Does, who were as of that date among nineteen John Does who had filed complaints in the Kennebec County Superior Court challenging the constitutionality of SORNA. Eventually, cases consolidated in this matter have involved as many as forty-seven John Does. In addition to the John Doe cases, there remain pending approximately four other cases, both civil and criminal, which have been sent for decision along with the John Does to the undersigned Justice at the direction of the Chief Justice of the Superior Court.

In 2008, before the issuance of the temporary restraining orders staying prosecutions of the plaintiffs for failure to register, the case was put on hold due to legislative activity in the spring of that year. LD 446, An Act to Improve the Use of Information Regarding Sex Offenders to Better Ensure Public Safety and Awareness, was passed by both houses of the Maine Legislature. It would have mooted out many, if not all, of the claims pending at that time. It would have relieved between 500 and 600 persons convicted of sex offenses between 1982 and 1992 from having to register under SORNA. When the court and parties became aware of the pending legislation it was agreed by all, in deference to that process, that all pending cases would be informally stayed. However, any hope that the legislation would relieve the court of the obligation to pass on the constitutionality of Maine's SORNA was dashed when Governor Baldacci announced on April 30, 2008, that he would not sign the bill.

The parties commenced discovery, and more plaintiffs joined. The parties and the court soon became aware of an appeal by the State from a decision of the Lewiston District Court (Stanfill, J.), which found Maine's SORNA statute facially unconstitutional as violative of a criminal defendant's right to be free from ex post facto laws. The Court then became aware of Justice Fritszche's decision in *State v. A.L.,* 2008 Me. Super LEXIS 164, along with decisions from other jurisdictions based upon state constitutions, including *Doe v. State of Alaska*, 189 P.3d 999 (Alas. 2008). In light of these decisions, and for other considerations, this Court provided limited temporary relief to certain John Does, allowing them to remain off of the registry during the pendency of the legal action. Then, in *State v. Letalien,* 2009 ME 130, 985 A.2d 4, the Maine Supreme Court agreed that certain portions of Maine's SORNA violated the prohibition against ex post facto laws. The Law Court stayed issuance of its mandate for ninety days to give the Maine Legislature an opportunity to address the constitutional violations found in *Letalien.* The Legislature responded by enacting P.L. 2009, Chapter 570 (124th Leg., LD

2

1822) which was signed into law by Governor Baldacci on March 30, 2010. This legislative response to *Letalien* is a primary focus of the motions before the court.

After the bill became law, the court conferred with all parties to discuss the course of future proceedings. Eventually, twenty-four of the forty-seven plaintiffs dismissed their complaints.[2] This court further decided that certain of the pending cases should proceed to decision through dispositive cross-motions. A briefing schedule was issued, and the so-called "Mitchell Does" were joined in their arguments by the three other John Does represented by Attorneys Walter McKee and Ron Bourget. Other plaintiffs elected to proceed separately, some of them having joined much later than the plaintiffs at issue here.[3]

With respect to all the cases currently handled by the undersigned Justice, including the ones that are not the subject of this order, nearly all[4] are ineligible to come off the SORNA registry in the wake of *Letalien* and the enactment of Chapter 570, with the exception of nine of the Mitchell Does (I, IV, VI, VII, VIII, XIII, XVI, XVIII, XXIV) who press on with their constitutional claims here, despite qualifying for statutory or automatic removal from the registry.

The most recent complaint addressing multiple plaintiffs was the Ninth Amended Complaint, filed by the Mitchell Law Firm on June 29, 2009.[5] The court specifically excused the filing of a tenth amended complaint on behalf of the Mitchell plaintiffs, allowing plaintiffs to argue with respect to the amendments without amending pleadings.

On October 30, 2009, this court dismissed the plaintiffs' claims for damages brought pursuant to Section 1983 and the Maine Civil Rights Act against all state defendants, finding that the counts had failed to state a claim. By order dated October 14, 2010, the court granted an

---

[2] John Does II, IX, XI, XII, XV, XX, XXI, XXII, XXV, XXVI, XXVII, XXVIII, XXIX, XXX, XXXI, XXXII, XXXIV, XXXV, XXXVI, XXXVIII, XXXIX, XL, XLI, and XLII have been dismissed from this action. John Doe XI was previously knows as John Doe, Jr. and originated in York County. John Doe XII was previously known as Richard Rowe I. See Order for Consolidation dated July 22, 2008. John Doe XV was previously known as Richard Rowe II. There remains another "Richard Rowe" case which is actually a criminal matter transferred to Kennebec County from York County on Sept. 10, 2010.

[3] Among the plaintiffs who did not join in this motion for summary judgment, one is a criminal defendant who has filed a motion to dismiss, one is a Rule 80(C) appeal, and one case, that of John Doe XXXVII, is factually distinguishable from the John Does who are the subject of this order.

[4] It appears that John Doe V will be eligible to petition for termination of his registration requirements in the near future, under the current version of 34-A M.R.S. §11202-A.

[5] John Doe XLIII was considered to have joined in the Ninth Amended Complaint. John Doe XLIV, represented by Samuel Cohen, filed a separate complaint dated on or about October 1, 2010. John Doe XLIII is participating the current motion for summary judgment; John Doe XLIV does not appear to have joined in the motion.

3

agreed-upon motion to sever, removing all county and municipal defendants, as well as plaintiff John Doe XXXVII, from this case. The primary purpose of the severance was to allow this court, with the agreement of the parties, to decide the claims advanced by Mitchell Does against the state defendants—including ex post facto arguments that remain unresolved for a number of plaintiffs in the wake of the *Letalien* decision and the corresponding legislative response—in order that the Maine Supreme Court could ultimately address the core constitutional issues generated. Depending on the Law Court's review of this order, it was agreed, the plaintiffs' claims against the other defendants could be narrowed or eliminated.

Of the plaintiffs who have joined in this motion for summary judgment, six—John Doe I, IV, VI, VII, VIII, and XVI—were once on the registry and successfully petitioned for removal pursuant to the statutory amendments. Three, John Doe XIII, XVIII, and XLIII, were never on the registry, having been granted a stay from any litigation to enforce the registration requirements pending the statutory amendments. One, John Doe XXIV, filed his initial registration papers, but was protected by a temporary restraining order from having his information fully processed and displayed on the Internet and other notification sites, and has since successfully petitioned to terminate his registration requirements. Thus, nine of the plaintiffs who have joined in this motion (I, IV, VI, VII, VIII, XIII, XVI, XVIII, XXIV) qualify for statutory or automatic removal from the registry.[6] Six of the plaintiffs who have joined this motion for summary judgment thus remain on the registry: John Doe III, V, X, XIV, XIX and XXIII.[7]

The counts remaining pending before the court from the Ninth Amended Complaint are as follows:

IV: Unconstitutionality of SORNA under the Constitution of the United States;
V: Unconstitutionality of SORNA under the Constitution of Maine;
VIII: Improper use of guilty pleas;
IX: Denial of trial by jury;
X: Violation of the Maine Civil Rights Act ("MCRA"); and
XI: Violation of 42 U.S.C. §1983.

---

[6] Although John Doe XLIII is not currently on the registry due to this court's granting a stay from any registration enforcement litigation, should the stay be lifted, he would be ineligible to petition for termination of his registration requirements because he does not meet the provisions of the current 34-A M.R.S. §11202-A(1)(C).

[7] The remaining John Does who did not join this motion for summary judgment are: XXXIII, represented by Attorney Francis Griffin, whose case was severed by order dated October 14, 2010; and John Doe XLIV, represented by Attorney Samuel Cohen.

The new challenges generated, subsequent to the Ninth Amended Complaint, by the enactment of Chapter 570 and the addition of John Doe XLIII include a request to add further facts for the court's analysis, as well as a challenge to 34-A M.R.S. §11221(1)(G) on the grounds that it is void for vagueness and for numerous violations of rights guaranteed by the Maine and federal Constitutions, and an argument that Chapter 570 is unconstitutional for failing to remedy the punishment declared unconstitutionally ex post facto in *State v. Letalien*, 2009 ME 130, 985 A.2d 4, as well as the application of the plaintiffs' remaining counts to Chapter 570. The state defendants have responded sequentially to the plaintiffs' arguments in their cross-motion for summary judgment.

The court will address the issues according to the plaintiffs' organization, which combines the counts remaining from the Ninth Amended Complaint and the new arguments related to Chapter 570, and includes the state defendants' argument that the plaintiffs who have been removed from the registry lack standing. That order is as follows, in addition to the ex post facto argument after the Law Court's ruling in *Letalien*: (1) Justiciability (including the standing issue); (2) Constitutionality of 34-A M.R.S. §11221(1)(G); (3) Equal protection; (4) Void for vagueness; (5) Procedural due process; (6) Substantive due process; (7) Cruel and unusual punishment; (8) Maine's Declaration of Rights, Article I, section 1 of the Maine Constitution; (9) Improper use of guilty plea; (10) Right to jury trial; and (11) Violation of Maine's Civil Rights Act.[8]

## STANDARD OF REVIEW

Summary judgment is appropriate when the court's review of the parties' statements of material fact and cited record evidence indicates there are no genuine issues of disputed material fact, and that the moving party is entitled to judgment as a matter of law. *Dyer v. Dep't. of Transportation*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825. A fact is material if it can affect the outcome of the case. *Id.* An issue of fact is genuine if "there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial." *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745, 747.

"Although no longer an extreme remedy, summary judgment is 'not a substitute for trial.'" *Cookson v. Brewer School Dep't*, 2009 ME 57, ¶ 12, 974 A.2d 276, 280 (quoting *Arrow*

---

[8] It is unclear to what extent the plaintiffs continue to advance their parallel argument under 42 U.S.C. §1983.

*Fastener Co. v. Wrabacon, Inc.,* 2007 ME 34, ¶ 18, 917 A.2d 123, 127). "Thus, 'even when one party's version of the facts appears more credible and persuasive to the court, a summary judgment is inappropriate if a genuine factual dispute exists that is material to the outcome,' in which case 'the dispute must be resolved through fact-finding,' regardless of the nonmoving party's likelihood of success." *Id.* (quoting *Arrow Fastener Co.*, 2007 ME 34, ¶ 17, 917 A.2d at 126-27). The nonmoving party may not rely on "conclusory allegations, improbable inferences, and unsupported speculation" to oppose summary judgment. *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d at 825 (quoting *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007)). "A court may properly enter a summary judgment in a case when the parties are not in dispute over the facts, but differ only as to the legal conclusions to be drawn from those facts." *Tondreau v. Sherwin-Williams Co.*, 638 A.2d 728, 730 (Me. 1994) (citing *Chadwick-BaRoss, Inc. v. T. Buck Constr., Inc.,* 627 A.2d 532, 534 (Me. 1993)).

## FINDINGS AND CONCLUSIONS

As a threshold issue, the plaintiffs seek to add further facts to the record for the court to consider in evaluating the motions for summary judgment. Prior to the Law Court's decision in *State v. Letalien*, 2009 ME 130, 985 A.2d 4, the parties engaged in considerable discovery. After *Letalien*, this court halted discovery due to the Law Court's holding that "the determination of the constitutionality of the retroactive application of SORNA of 1999 depends on a facial examination of the statute, and not on an as-applied analysis as we previously suggested in *Doe v. District Attorney,* 2007 ME 139, 932 A.2d 552." *Letalien*, 2009 ME 130, ¶ 1, 985 A.2d 4, 7. The plaintiffs now seek to introduce evidence based upon the previously-conducted discovery for the court to consider in evaluating their challenges to SORNA based upon grounds other than an allegation that it is in violation of the ex post facto clause. In response, the state defendants cite *Letalien*, and point out that the plaintiffs' decision to plead in pseudonym, to which the state defendants objected, results in the state defendants' inability to adequately challenge the plaintiffs' stated facts.

The court recognizes the state defendants' argument that the plaintiffs may gain an unfair advantage in a factual inquiry by pleading in pseudonym. Both parties, however, have submitted extensive statements of undisputed facts, and many of the John Does have been deposed. If the court finds that the facts to which the parties explicitly agree support an as-applied challenge, the court will consider those agreed-upon facts. Likewise, those counts to which the plaintiffs'

6

challenge is facial can proceed based upon minimal or no fact-finding. The court will consider briefly which of the plaintiffs' challenges are to be evaluated facially and which proceed "as applied," thus requiring the court to determine if the parties explicitly agree on the facts underlying the claim. Any claims which are analyzed "as applied," and as to which the parties' facts do not agree closely enough to allow the court to consider them are not appropriate for summary judgment.

## 1. Ex Post Facto

"The prohibition on ex post fact laws in the Maine Constitution, *Me. Const. art. I, β 11*, is coextensive with the corresponding prohibition in the United States Constitution, *U.S. Const. art. I, β 10, cl. 1*." *State v. Letalien*, 2009 ME 130, ¶ 63, 985 A.2d at 26. "[T]he determination of the constitutionality of the retroactive application of SORNA of 1999 depends on a facial examination of the statute, and not on an as-applied analysis as we previously suggested in *Doe v. District Attorney*, 2007 ME 139, 932 A.2d 552." *Id.* at ¶ 1, 985 A.2d at 7; *see also id.* at ¶ 63, 985 A.2d at 26 ("For ex post facto purposes, SORNA of 1999 is properly evaluated on its face, and not in relation to how it has been applied against any individuals. Our suggestion to the contrary in *Doe v. District Attorney*, 2007 ME 139, 932 A.2d 552, is overruled.").

Because the court's analysis is based upon a facial reading of the statute alone, the court need not consider the parties' factual allegations.

## 2. Justiciability:

> One who seeks to initiate or continue proceedings in federal court must demonstrate, among other requirements, both standing to obtain the relief requested, see *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992), and, in addition, an "ongoing interest in the dispute" on the part of the opposing party that is sufficient to establish "concrete adverseness." *Camreta* v. *Greene*, 563 U.S. ___, ___, 179 L. Ed. 2d 1118, 1125 (2011) (internal quotation marks omitted).

*Bond v. United States*, ___ U.S. ___, ___, 131 S. Ct. 2355, 2361 (2011). Though the plaintiffs plead their case before the Maine courts rather than the federal courts, standing and a case and controversy are requirements of this court as well. *See, e.g., Collins v. State*, 2000 ME 85, ¶¶ 5-6, 750 A.2d 1257, 1260 ("A party must assert a personal stake in the outcome of the litigation and present a real and substantial controversy touching on the legal relations of parties with

adverse legal interests. . . . [A] party must show they suffered an injury that is fairly traceable to the challenged action and that is likely to be redressed by the judicial relief sought. . . . Further, the injury must be particularized.") (quotations and citations omitted). In order to determine the plaintiff Does' "ongoing interest in the dispute," the court will need to consider facts to evaluate whether each individual plaintiff has alleged a concrete injury, caused by SORNA of 1999 and redressable by invalidation of that statute. *See Bond*, 131 S. Ct. at 2361. The court will examine the parties' statements of material fact to ensure that both parties agree to the facts constituting the alleged injuries.

## 3. Constitutionality of 34-A M.R.S. §11221(1)(G)

The plaintiffs' challenge to the statute is facial; the court need not consider any facts.

## 4 Equal protection

> The equal protection clause of the Maine Constitution provides that "[n]o person shall . . . be denied the equal protection of the laws . . . ." ME. CONST. art. I, § 6-A. The United States Constitution provides similarly, and the two clauses provide co-extensive protection. *See* U.S. CONST. amend. XIV, § 1; *Sch. Admin. Dist. No. 1 v. Comm'r, Dep't of Educ.* ,659 A.2d 854, 857 (Me. 1995). We apply a two-step test to determine whether a statute violates the equal protection clause. First, the party challenging the statute must show that similarly situated persons are not treated equally under the law. *See Mahaney v. State*, 610 A.2d 738, 743 (Me. 1992). Where this step is met, the Court must then determine what level of scrutiny to apply. *See Sch. Admin. Dist. No. 1*, 659 A.2d at 857. Where, as here, the challenged legislation does not involve a fundamental right or a suspect class, the test under this step is whether the statute is rationally related to a legitimate state interest. *Id.*

*Town of Frye Island v. State*, 2008 ME 27, ¶ 14, 940 A.2d 1065, 1069.

An inquiry involving a determination of whether similarly situated persons are treated equally under the law must proceed on the basis of facts presented by the party challenging the statute (here, the plaintiffs). The court will consider the facts presented, to the extent they are agreed to by the state defendants, in evaluating the parties' motions for summary judgment. However, if the court can determine the statute's validity based upon the second step only, then the state defendants may be entitled to summary judgment without reference to the equal treatment of similarly situated persons.

## 5. Void for vagueness

By definition, this argument attacks the statute facially, and consideration of particular facts would be inappropriate in evaluating whether the statute itself is unconstitutionally vague.

## 6. Procedural due process

"The due process rights guaranteed by the Maine Constitution, Me. Const. art. I, § 6-A, are coextensive with those guaranteed by the Fourteenth Amendment of the U.S. Constitution." *Northup v. Poling*, 2000 ME 199, ¶ 9 n.5, 761 A.2d 872, 875 n.5.

> The Fourteenth Amendment to the United States Constitution and Maine Constitution, article I, section 6-A protect individuals from deprivations of life, liberty, or property by the State without due process of law. U.S. Const. amend. XIV § 1; Me. Const. art. I, § 6-A. *See also* Me. Const. art. I, § 19 (providing a right to redress for injuries). To find a violation of the Fourteenth Amendment, therefore, there must be (1) state action; (2) a deprivation of a life, liberty, or property interest; and (3) inadequate process.

*Botting v. Dep't of Behavioral & Developmental Servs.*, 2003 ME 152, ¶ 23, 838 A.2d 1168, 1176.

While the parties agree that SORNA of 1999 represents state action, analysis of the deprivation of the plaintiffs' alleged interests, and of the process they received in relation to the process due, requires the consideration of certain facts. The court will consider them to the extent the parties agree to the facts at issue.

## 7. Substantive due process

The Law Court has "repeatedly held that federal and Maine due process rights are coextensive." *State v. Millikin*, 2010 ME 1, ¶ 16, 985 A.2d 1152, 1157-58.

> The doctrine of substantive due process "does not protect individuals from all governmental actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents 'governmental power from being used for purposes of oppression,' or 'abuse of government power that shocks the conscience,' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.'"

*PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28, 31-32 (1st Cir. 1991) (quoting *Committee of U.S. Citizens in Nicaragua v. Reagan*, 859 F.2d 929, 943 (D.C. Cir. 1988)) (brackets omitted).

The Supreme Court has identified two primary features of its established method of substantive due process analysis:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in

9

this Nation's history and tradition," [*Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)] (plurality opinion); *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937). Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. [*Reno v. Flores*, 507 U.S. 292, 302 (1993); *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992); *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 277-78 (1990)].

*Washington v. Glucksburg*, 521 U.S. 702, 720-21 (1997); *Green v. Comm'r of Mental Health & Mental Retardation*, 2000 ME 92, ¶ 13, 750 A.2d 1265, 1270. "[T]he *Fourteenth Amendment* 'forbids the government to infringe . . . 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Glucksburg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). However, "[w]hen the State exercises its police power to regulate for the general welfare and a fundamental right is not at issue, statutes are subjected to rational basis review." *State v. Haskell*, 2008 ME 82, ¶ 5, 955 A.2d 737, 739. "Great deference is given to social and economic regulations, and reasonableness is presumed because it is the job of the Legislature, not the courts, to balance competing interests. Consequently, the party challenging a statute has the burden of proving its constitutional deficiency." *Id.* (citation omitted). "In order to prevail, a party 'must establish the complete absence of any state of facts that would support the need for [the statute's] enactment.'" *Id.* (quoting *Aseptic Packaging Council v. State*, 637 A.2d 457, 461 (Me. 1994)).

> The contention that a statute enacted as a purported exercise of a state's police power is unconstitutional, as violative of substantive due process of law, precipitates three inquiries: (1) whether the objective of the exercise of the police power is legitimately within the scope of police power action; (2) whether the means employed are appropriate to the achievement of the objective; and (3) whether the manner in which the power is exercised is arbitrary or capricious.

*State v. Nat'l Adver. Co.*, 409 A.2d 1277, 1288 (Me. 1979). "[T]he statute's justification need not be expressly articulated or readily apparent 'so long as a court can divine some rational purpose.'" *Ngo v. State*, 2008 ME 71, ¶ 14, 946 A.2d 424, 429 (quoting *United States v. Neal*, 46 F.3d 1405, 1409 (7th Cir. 1995)).

Because the plaintiffs, in order to invalidate the statute, must establish either a fundamental right and the absence of narrow tailoring to a compelling state interest, OR the

complete absence of any state of facts that would support the need for the statute's enactment, the court may consider the facts presented. However, it appears that a substantive due process challenge in fact extends beyond the facts presented by the parties, as a statute that does not infringe upon fundamental rights will be upheld, regardless of the legislature's cited facts, so long as a court can divine some rational purpose.

## 8. Cruel and unusual punishment

> Article I of the Maine Constitution is a declaration of rights enjoyed by Maine citizens. *Section 9* sets limits on the State's power to punish: "Sanguinary laws shall not be passed; all penalties and punishments shall be proportioned to the offense; excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted." *Me. Const. art. I, β 9.*

*State v. Gilman*, 2010 ME 35, ¶ 12, 993 A.2d 14, 18. "[W]e hold that the clause, 'all penalties and punishments shall be proportioned to the offense,' means what its plain language says, and does not require consideration of the individual circumstances of each offender." *Id.* at ¶ 21, 993 A.2d at 21.

This count therefore does not require the court to consider any individualized facts other than the offense or offenses of which each plaintiff was convicted.

## 9. Maine's Declaration of Rights

The argument under Article I, Section 1 of the Maine Constitution is somewhat akin to a due process argument—the plaintiffs assert that this provision makes the rights that it guarantees Mainers "fundamental" rights for the purposes of a substantive due process analysis. Because the court will consider the facts agreed upon in its substantive due process analysis, it will consider the same agreed-upon facts for its determination under the Maine Declaration of Rights.

## 10. Improper use of guilty plea

The plaintiffs agree that their argument regarding the post hoc imposition of additional requirements based upon a guilty plea is in essence an ex post facto argument, in that for the state to "expand the consequences [of the plea] violates those [plea] agreements to the extent the expansion is punishment." (Reply Memo. of Mitchell Firm Pls. and Opp. to State Defs. Cross-Mot. for Summ. J. at 22.) Because the parties agree that the analysis of this count is the ex post facto analysis under *State v. Letalien*, 2009 ME 130, 985 A.2d 4, and *Letalien* clearly states that

such analysis is facial rather than as-applied (*id.* at ¶ 1, 985 A.2d at 7), the court need not consider factual submissions in analyzing this claim.

## 11. Right to jury trial

The plaintiffs acknowledge, "The state defendants are correct that if plaintiffs are entitled to no hearing on dangerousness, they are not entitled to a jury trial." (Reply Memo. of Mitchell Firm Pls. and Opp. to State Defs. Cross-Mot. for Summ. J. at 22.) The basis for their argument of entitlement to a jury trial on the issue of dangerousness stems from an allegation that Maine's registration system has become offender-based rather than offense-based, and that a hearing on dangerousness is therefore required. This appears to be a facial challenge to the statute within the procedural due process framework, and will require no consideration of additional factual submissions.

## 12. Violation of the MCRA

The parties' arguments are limited to the recovery of restitution from the state, following this court's dismissal of the claims for damages under the MCRA and 42 U.S.C. §1983 on September 20, 2009. The court need not consider facts regarding the individual plaintiffs in making its determination of the availability of restitution under the MCRA.

Having determined which of the plaintiffs' claims require the court to consider the parties' agreed-upon facts, the court will turn to the substantive analysis of the issues. For the sake of efficiency, the court inverts the order of the ex post facto and justiciability analysis, as the determination of the number of plaintiffs who stand to gain from this action will permeate the analysis of all of the other claims.

## I. Justiciability

As noted above, justiciability requires that the plaintiffs establish both standing to obtain the relief requested, and a case and controversy, including an "'ongoing interest in the dispute' on the part of the opposing party that is sufficient to establish 'concrete adverseness.'" *Bond v. United States*, ___ U.S. at ___, 131 S. Ct. at 2361 (quoting *Camreta v. Greene*, 563 U.S.at ___, 179 L. Ed. 2d at 1125). The State has argued that those plaintiffs who have been removed from

12

the registry pursuant to Chapter 570 have no further interest in the dispute, so the court lacks jurisdiction absent a claim upon which these plaintiffs could recover. The plaintiffs counter that even those plaintiffs who are no longer on the registry have a remedy to recover in this lawsuit, including restitution under their MCRA and 42 U.S.C. §1983 claims, and a declaratory judgment that the law under which they registered is unconstitutional, and that these claims are sufficient to ensure their ongoing presence in this action.

The court discusses the MRCA and 42 U.S.C. §1983 arguments below, but for the purposes of justiciability must reveal that the plaintiffs do not prevail on those arguments. Therefore, the "ongoing interest in the dispute" that the plaintiffs who are no longer on the registry allege is limited to a declaratory judgment that the law under which they registered, since modified by Chapter 570, is unconstitutional. The plaintiffs' logic appears to be circular. They assert that, "to support the restitution, the plaintiffs no longer on the registry are entitled to a declaration that the prior law under which they were registered is unconstitutional, a finding essentially mandated by *Letalien* even though they were not sentenced to registration as he was." The purpose of requesting this declaratory judgment is that restitution cannot be awarded against the state as a retroactive remedy, but only as an award ancillary to a prospective remedy. *See, e.g., Papasan v. Allain*, 478 U.S. 265, 278 (1986) (relief that is "tantamount to an award of damages for a past violation of . . . law, even though styled as something else," is barred by sovereign immunity). So the plaintiffs' argument for justiciability is that they still have a valid case and controversy because they can recover restitution ancillary to a prospective declaratory judgment regarding illegality of their original registration requirements.

However, declaratory judgment actions in fact have the same requirements regarding a valid and not moot case or controversy as other actions. *See, e.g., Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) ("this Court, noting the difficulty in fashioning a precise test of universal application for determining whether a request for declaratory relief had become moot, held that, basically, 'the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.*'") (quoting *Maryland Cas. Co. v. Pacific Co.*, 312 U.S. 270, 273 (1941)); *Wagner v. Sec'y of State*, 663 A.2d 564, 567 (Me. 1995) ("The declaratory judgment statute is 'operative only in cases where a genuine controversy exists.'") (quoting *National Hearing Aid Ctrs., Inc. v. Smith*, 376 A.2d 456,

458 (Me. 1977)); *Hodgdon v. Campbell*, 411 A.2d 667, 670 (Me. 1980) ("All courts require the declaratory plaintiff to show jurisdiction, a justiciable controversy and the joinder of necessary parties.").

The court believes that the issue here is not ripeness, which both parties explicitly addressed, but mootness. "Mootness 'is the doctrine of standing set in a time frame: The requisite personal interest that existed at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Ten Citizens of the Town of Biddeford v. Town of Biddeford*, 2003 ME 59, ¶ 5, 822 A.2d 1196, 1199 (quoting *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1379 (Me. 1996)). Courts analyze "mootness by examining the record to determine 'whether there remain sufficient practical effects flowing from the resolution of the litigation to justify the application of limited judicial resources.'" *Id.* (quoting *Lewiston Daily Sun v. Sch. Admin. Dist. No. 43*, 1999 ME 143, ¶ 14, 738 A.2d 1239, 1243). "A dispute loses its controversial vitality when a decision by this court would not provide [a litigant] any real or effective relief." *Id.* at ¶ 6, 822 A.2d at 1199 (quoting *Int'l Paper Co. v. United Paperworkers Int'l Union*, 551 A.2d 1356, 1360-61 (Me. 1988)). "The Declaratory Judgments Act, 14 M.R.S.A. ßß 5951-5963 (2003), also does not authorize their claim in the absence of injury. We have consistently held that the Act may only be invoked when there is a genuine controversy." *Id.* at ¶ 7, 822 A.2d at 1200.

There is no relief that this court could provide the plaintiffs who have already been removed from the registry. Their petition for a declaratory judgment seeks a judgment on an alleged wrong (the registration and associated costs for those plaintiffs currently free of registration requirements) that is no longer present, so the declaratory judgment action is moot. They cannot collect restitution from the state in the absence of a prospective claim, so that claim does not avail them.[9] Because the court could not provide "any real or effective relief" to those plaintiffs who have already had their registration obligations terminated, their claims are moot. The state defendants' motion for summary judgment to this effect is GRANTED; the plaintiffs' motion for summary judgment as to their continued vitality is DENIED.

## II. Ex post facto

---

[9] This proposition, and the precedent supporting it, is discussed in more detail in connection with the plaintiffs' MCRA claim below.

14

## 1. The parties' arguments and the court's task after *Letalien*

The plaintiffs contend that the imposition of any registration requirement on any plaintiff sentenced before 1991 constitutes an unconstitutional ex post facto act, and therefore seek to reargue several arguments struck down in *Letalien* as to registrants who were sentenced after 1991, when Maine's first sex offender registration law took effect. They ultimately focus on the three elements that the *Letalien* court identified as posing a constitutional problem—lifetime registration, quarterly in-person verification, and the absence of a waiver procedure, *see Letalien*, 2009 ME 130, ¶ 62, 985 A.2d at 26—and apply the *Mendoza-Martinez* factors to those three elements in light of the legislative changes of Chapter 570 and the status of the plaintiffs as having been sentenced prior to 1992.[10]

The plaintiffs also focus on clear language in *Letalien* that suggests to them that any statutory scheme that fails to provide some opportunity for an offender, any offender, to petition for termination of SORNA obligations at some point in his or her lifetime violates the mandate of that case. Indeed, the holding of *Letalien* is as follows:

> Specifically, we hold that the retroactive application of the lifetime registration requirement and quarterly in-person verification procedures of SORNA of 1999 to offenders originally sentenced subject to SORA of 1991 and SORNA of 1995, without, at a minimum, affording those offenders any opportunity to ever be relieved of the duty as was permitted under those laws, is punitive. As to these offenders, the retroactive application of SORNA of 1999 is an unconstitutional ex post facto law because it makes more burdensome the punishment for a crime after its commission.

*Id.* at ¶ 62, 985 A.2d at 26 (quotations omitted). Unsurprisingly, the plaintiffs conclude that SORNA of 1999, as revised, is unconstitutionally ex post facto as applied to them because the statutory amendments make it impossible, based on legislative categorization of offenders, to ever be free of the requirements of SORNA.

SORA of 1991 and SORNA of 1995 did in fact provide an opportunity to be relieved of SORNA's requirements to *all* offenders subject to the provisions of those laws. SORA of 1991 provided that its registration requirements could be waived under four circumstances: (1) vacating of the conviction; (2) granting of a full and free pardon; (3) issuance of a certificate of

---

[10] Doe V was convicted in 1993, but was not subject to sex offender registration until the 2001 amendments to SORNA of 1999. *See Doe v. District Attorney*, 2007 ME 139, ¶ 14, 932 A.2d 552, 556 ("In 2001, the Legislature amended SORNA to apply retroactively to sex offenders sentenced on or after June 30, 1992. *See* P.L. 2001, ch. 439, ß OOO-7 (effective Sept. 21, 2001) (codified at *34-A M.R.S.A. ß 11202* (Supp. 2001)).")

rehabilitation by a licensed counselor certified by the Forensic Evaluation Unit at the Department of Mental Health and Mental Retardation that deals with sex offenders; or (4) waiver of the registration requirement by the sentencing court for good cause shown. 34-A M.R.S §11003 (1992), *repealed by* P.L. 2001, ch. 439, § OOO-5 (effective Sept. 1, 2001). It was amended in 1993 by P.L. 1993, chapter 193 §3, which repealed the provision for waiver upon issuance of a certificate of rehabilitation, and provided instead for waiver if:

> The Superior Court, upon the petition of the sex offender, waives the registration requirement.
> A sex offender may not petition for waiver of the registration requirement until at least 5 years after the sex offender is first required to register.
> A sex offender may petition once a year for waiver of the registration requirement.
> Before waiving the registration requirement, the court must determine that the sex offender has shown a reasonable likelihood that registration is no longer necessary and waiver of the registration requirement is appropriate. The court shall consider the sex offender's progress in treatment and may request an independent forensic evaluation provided through the State Forensic Service. If the court orders an independent forensic evaluation, the court shall reimburse the State Forensic Service for the cost of the evaluation and order the sex offender to reimburse the court for the cost of the evaluation . . . .

34-A M.R.S. §11003 (C-1) (1993), *repealed by* P.L. 2001, ch. 439, §OOO-5 (effective Sept. 21, 2001). SORNA of 1995 maintained the 1993 amendments. 34-A M.R.S. §§11003, 11121 (1996), *repealed by* P.L. 2001, ch. 439 §OOO-5 (effective Sept. 21, 2001).

The fact that the Law Court's holding in *Letalien* points specifically to the waiver provisions of SORA of 1991 and SORNA of 1995, together with the clear language, "without at a minimum, affording those offenders any opportunity to *ever* be relieved of the duty as was permitted under those laws," *Letalien*, 2009 ME 130, ¶ 62, 985 A.2d at 26 (emphasis added), suggests to this court that the Law Court was in fact concerned about any statutory scheme which imposed retroactive lifetime obligations on offenders without providing any opportunity to be relieved of those obligations.

The court also recognizes the plaintiffs' argument that the legislature sought to add an individualized waiver scheme to Chapter 570, and that the only reason an individualized waiver scheme was not included was that it would cost too much money for the judicial branch. The plaintiffs point to the summary of H.P. 1305, L.D. 1822, the bill that was signed into law as P.L. 2009, ch. 570, which provides in pertinent part: "An additional waiver scheme that authorized

registrants to petition the court for relief from the duty to register was not included in the bill at this juncture due to a substantial fiscal note from the judicial branch, but may be considered again in the next legislative session." (Mitchell Pls. S.M.F. 20, quoting L.D. 1822, Summary (124th Legis. 2010)).

Turning to the state defendants' arguments, they contend that the Law Court's holding in *Letalien* that SORNA of 1999 was unconstitutionally ex post facto as applied to those sentenced under SORA of 1991 and SORNA of 1995 was based upon the combination of four factors: (1) the fact that the original registration requirements were part of the offender's sentence; (2) the increase of registration time to a lifetime requirement; (3) new quarterly in-person verification requirements; and (4) removal of the opportunity to be relieved from the registration requirements. Because *Letalien* was grounded in the combination of these factors, the state defendants argue, the legislature's modifications to these requirements under Chapter 570, including reduction of the in-person verification requirements and allowing large classes of registrants to petition for relief from registry verification requirements, relieve the burden that was found in the aggregate to be unconstitutionally ex post facto.

The state defendants contend that the plaintiffs are in a different position than *Letalien* in that they were not sentenced under SORA or SORNA, so that the requirements of SORNA of 1999, imposed upon the majority of these plaintiffs in 2005,[11] did not modify their sentences and thus cannot constitute an ex post facto punishment. The state points to the language in *Letalien* which focused on the "unique history of the development of sex offender registration laws in Maine," together with the conclusion that "[b]ecause sex offender registration was *required* to be part of Letalien's criminal *sentence,* the retroactive application of SORNA of 1999's requirements to Letalien modified and enhanced a portion of his sentence." *Letalien,* 2009 ME 130, ¶¶ 39, 43, 985 A.2d at 19, 20 (emphasis added). This court finds that argument to be quite unpersuasive. The court believes that the Law Court was using this analysis to conclude that Letalien was subject to punishment by the enactment of SORNA of 1999 in its removal of a

---

[11] *See Doe v. District Attorney,* 2007 ME 139, ¶ 14, 932 A.2d 552, 556 ("In 2001, the Legislature amended SORNA to apply retroactively to sex offenders sentenced on or after June 30, 1992. *See* P.L. 2001, ch. 439, ß OOO-7 (effective Sept. 21, 2001) (codified at *34-A M.R.S.A. ß 11202* (Supp. 2001)). . . . The Legislature amended SORNA in 2005 to apply retroactively to all sex offenders sentenced as of January 1, 1982. P.L. 2005, ch. 423, ß 1 (effective Sept. 17, 2005) (codified at *34-A M.R.S. ß 11202* (2006))."). Doe V was convicted in 1993, but was not subject to sex offender registration until the 2001 amendments to SORNA of 1999. Does III, X, XIV, XIX, XXIII, and XLIII became subject under the 2005 amendments.

waiver provision, and not as a suggestion that any offender sentenced before the enactment of SORA of 1991 and SORNA of 1995 would be ineligible to even argue that he or she ought to be protected from imposition of an ex post facto law.

> The presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords the individual citizen. That presumption "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Products,* 511 U.S. 244, 265, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994). This doctrine finds expression in several provisions of our Constitution. [12] The specific prohibition on *ex post facto* laws is only one aspect of the broader constitutional protection against arbitrary changes in the law. In both the civil and the criminal context, the Constitution places limits on the sovereign's ability to use its lawmaking power to modify bargains it has made with its subjects. The basic principle is one that protects not only the rich and the powerful, *United States v. Winstar Corp.,* 518 U.S. 839, 135 L. Ed. 2d 964, 116 S. Ct. 2432 (1996), but also the indigent defendant engaged in negotiations that may lead to an acknowledgment of guilt and a suitable punishment.
>
> > [12] "The *Ex Post Facto* Clause flatly prohibits retroactive application of penal legislation. . . . The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation . . . ." *Landgraf v. USI Film Products, 511 U.S. at 266* (footnote omitted).

*Lynce v. Mathis,* 519 U.S. 433, 439-40 (1997). "The bulk of [the Supreme Court's] *ex post facto* jurisprudence has involved claims that a law has inflicted 'a greater punishment, than the law annexed to the crime, when committed.'" *Id.* at 441 (quoting *Calder v. Bull,* 3 U.S. 386, 3 Dall. 386, 390, 1 L. Ed. 648 (1798)). "[S]uch laws implicate the central concerns of the *Ex Post Facto* Clause: 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" *Id.* (quoting *Weaver v. Graham,* 450 U.S. 24, 30, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981)).

"To fall within the *ex post facto* prohibition, a law must be retrospective--that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment for the crime." *Id.* (quoting *Weaver,* 450 U.S. at 29, and citing *Collins v. Youngblood,* 497 U.S. 37, 50 (1990)). The sex offense convictions serving as the predicate for the plaintiffs' registration requirements occurred before the enactment of SORNA of 1999. And the registration and verification requirements do "disadvantage" the plaintiffs, in that their convictions, already a matter of public record, are made easily available by the registry, and in that they must report to law enforcement

and provide information to law enforcement on a regular basis, in some cases for the duration of the offender's lifetime.

The state defendants' assertion that any number of requirements, no matter how onerous, may be heaped onto the plaintiffs based upon their convictions without "increasing the punishment for the crime" because the plaintiffs were sentenced prior to the existence of any sex offender registry defies logic, and is constitutionally unsound. The court has already ascertained that a retrospective law disadvantaged the plaintiffs; it is a matter of delicate balancing pursuant to the intent-effects test (see Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-169 (1963), discussed below) to determine whether that retrospective law had effects so punitive that it must be considered a criminal sanction rather than the civil categorization the legislature intended. The analysis of whether SORNA of 1999, as amended, increased the punishment for the plaintiffs' crimes is thus completely independent of their original sentences; it is the convictions, rather than the sentences, which serve as the predicate for the applicability of SORNA of 1999, and the Mendoza-Martinez intent-effects test which will help the court to determine whether SORNA of 1999 goes beyond disadvantageous and into unconstitutionally retrospectively punitive.

This court conceives the task before it to be fundamentally different from the framework proposed by both the plaintiffs and state defendants. The court rejects, in part, the notion that there are four factors which worked in combination to make SORNA of 1999 unconstitutional, as the court has found highly unpersuasive the state's argument that the plaintiffs are not eligible to challenge Chapter 570 because they were not sentenced under SORA or SORNA. However, the court does agree that it must consider the state defendants' argument that the Law Court in Letalien found SORNA of 1999 to be unconstitutional based upon a combination of factors, but finds that there are three and not four factors to be considered. Those factors are, as the plaintiffs also highlight: (1) the increase of registration to a lifetime requirement; (2) new quarterly in-person verification requirements; and (3) removal of the opportunity to be relieved from the registration requirements. The state defendants' argument is that, since Letalien was grounded in the combination of these factors, the legislative response to Letalien is constitutional because Chapter 570 reduced the in-person verification requirements and allowed large classes of registrants to petition for relief from registry verification requirements, thus relieving two of the three factors in some measure. The plaintiffs emphasize the language from the holding of

*Letalien,* discussed above, which they asserts render the legislative response constitutionally inadequate because, among other reasons, there remain large numbers of offenders who can never be relieved from obligations imposed by SORNA.

The tasks before the court include a reconciliation, to the extent possible, of the language in *Letalien* suggesting that the provisions of SORNA of 1999 imposing, after sentence, lifetime registration and verification obligations for offenders without an opportunity for the offenders ever to relieved of those obligations was constitutionally unacceptable, with other language from the case that may suggest that it was a combination of the three factors described above that was constitutionally unacceptable. The primary focus of the court's decision, however—at least this much is clear from *Letalien*—must be application of the *Mendoza-Martinez* intent-effects test to the legislative response to the Law Court's decision in that case.

## 2. Application of the *Mendoza-Martinez* intent-effects test

The United States Constitution provides that "[n]o State shall . . . pass any . . . ex post facto Law." U.S. Const. art. I, § 10, cl. 1. The Maine Constitution likewise provides, "The Legislature shall pass no . . . ex post facto law." Me. Const. art. I, § 11. "[T]he ex post facto clauses of the Maine and United States Constitutions are interpreted similarly and are coextensive." *Letalien,* 2009 ME 130, ¶ 25, 985 A.2d at 14. A "statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed," is an ex post facto law. *Id.* at ¶ 17, 985 A.2d at 12 (quoting *Collins v. Youngblood,* 497 U.S. 37, 42 (1990)).

In analyzing ex post facto challenges to SORNA of 1999, the Law Court has consistently followed "the two-step 'intent/effects' test employed by the United States Supreme Court in [*Smith v. Doe,* 538 U.S. 84, 92 (2003)], and *Hudson v. United States,* 522 U.S. 93, 99, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1997)." *Letalien,* 2009 ME 130, ¶ 29, 985 A.2d at 16 (citing *State v. Haskell,* 2001 ME 154, ¶¶ 8-22, 784 A.2d 4, 8-16, and *Doe,* 2007 ME 139, ¶¶ 22-28, 32, 36, 932 A.2d at 559-63). "If SORNA measures are deemed civil rather than criminal in nature . . . they do not implicate the Ex Post Facto Clause." *Haskell,* 2001 ME 154, ¶ 7, 784 A.2d at 8.

> Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. A court must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for

one label or the other. Even in those cases where the legislature has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty. In making this latter determination, the factors listed in *Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-169, 83 S. Ct. 554, 567-568, 9 L. Ed. 2d 644 (1963)*, provide useful guideposts, including: (1) "whether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned." It is important to note, however, that "these factors must be considered in relation to the statute on its face," *id. at 169, 83 S. Ct. at 568*, and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.

*Id.* at ¶ 8, 784 A.2d at 8 (quoting *Hudson v. United States*, 522 U.S. 93, 99-100 (1997)). "[T]he Supreme Court has intimated . . . that the most significant question under the effects stage of the analysis is whether the law, 'while perhaps having certain punitive aspects, serves important non punitive goals.'" *Id.* at ¶ 9, 784 A.2d at 9 (quoting *United States v. Ursery*, 518 U.S. 267, 290, (1996)).

The law court has repeatedly held that SORNA of 1999 "was intended by the Legislature to be a civil regulatory statute," noting "the Legislature's express statement that SORNA of 1999 is intended to 'protect the public from potentially dangerous registrants by enhancing access to information concerning those registrants,'" and that the Legislature "placed SORNA of 1999 entirely outside of the Criminal Code." *Letalien*, 2009 ME 130, ¶ 30, 985 A.2d at 16 (quoting 34-A M.R.S. § 11201 (2008)); *see also State v. Cosgro*, 2008 ME 64, ¶ 3 n.1, 945 A.2d 1221, 1223; *Doe*, 2007 ME 139, ¶ 27, 932 A.2d at 560; *Haskell*, 2001 ME 154, ¶ 12, 784 A.2d at 10. Given that the law court's analysis is clear on this factor, the plaintiffs' burden is also clear-cut: "one challenging a statute as imposing ex post facto punishment must demonstrate by the clearest proof that the statute is so punitive in purpose or effect as to overcome the Legislature's civil intent." *Cosgro*, 2008 ME 64, ¶ 2, 945 A.2d at 1222 (quotations omitted). With this standard in mind, the court turns to the analysis of the seven *Mendoza-Martinez* factors.

i. Affirmative disability or restraint

As to the first factor, "affirmative disability or restraint" (*see Mendoza-Martinez*, 372 U.S. at 168), the Law Court held in *Letalien* that "quarterly, in-person verification of identity and location of home, school, and employment at a local police station, including fingerprinting and the submission of a photograph, for the remainder of one's life, is undoubtedly a form of significant supervision by the state," constituting a "disability or restraint that is neither minor nor indirect." *Letalien*, 2009 ME 130, ¶ 37, 985 A.2d at 18. The *Letalien* court distinguished Maine's then-applicable registration scheme from cases where the sex offender registration laws had been held not to impose a restraint "because the relevant laws afforded offenders the opportunity to seek the early termination of the registration requirement." *Letalien*, 2009 ME 130, ¶ 37 n. 9, 985 A.2d at 18 n.9 (citing *Doe v. Pataki*, 120 F.3d 1263, 1284-85 (2d Cir. 1997), *amended on other grounds by* 120 F.3d 1263, 1285 (2d Cir. 1997) (addressing a duty to register in person every ninety days for a minimum of ten years); *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367, 378 (N.J. 1995) (noting that the statute's lifetime registration requirements could be terminated early if an offender is offense-free for fifteen years and "can persuade the court that he or she is not likely to pose a threat to the safety of others")). The *Letalien* court went on to note that a third case, *Doe v. Otte*, 259 F.3d 979, 987 (9th Cir. 2001), had been reversed by the United States Supreme Court in *Smith v. Doe*, 538 U.S. 84, 106 (2003), wherein the Supreme Court noted that the Ninth Circuit opinion, which had ruled that lifelong quarterly in-person verification did create an affirmative disability, had mistakenly construed the Alaska statute as requiring in-person updates. *Smith*, 538 U.S. at 101; *see also Doe v. District Attorney*, 2007 ME 139, ¶ 32, 932 A.2d at 562.

The Law Court's analysis of this factor supports the state defendants' argument that *Letalien* stands for the proposition that the requirements imposed by SORNA of 1999, taken cumulatively, amounted to an unconstitutional ex post facto punishment. By distinguishing cases where the burden of in-person registration requirements was ameliorated by an opportunity to seek termination of the registration requirement, the court believes the Law Court gives some indication of the meaning of its oft-quoted sentence: "[W]e hold that the retroactive application of the lifetime registration requirement and quarterly in-person verification procedures of SORNA of 1999 to offenders originally sentenced subject to SORA of 1991 and SORNA of 1995, without, at a minimum, affording those offenders any opportunity to ever be relieved of

the duty as was permitted under those laws, is punitive." *Letalien*, 2009 ME 130, ¶ 62, 985 A.2d at 26.

However, the question remains as to whether the requirements of SORNA of 1999, as revised by Chapter 570, constitute an affirmative disability and restraint as to registrants convicted of crimes prior to 1991. The Law Court specifically found that the in-person verification procedures constituted a significant and direct disability and restraint, noting, "These provisions, which require lifetime registrants, under threat of prosecution, to physically appear at their local law enforcement agencies within five days of receiving a notice by mail, place substantial restrictions on the movements of lifetime registrants and may work an 'impractical impediment that amounts to an affirmative disability.'" *Id.* at ¶ 37, 985 A.2d at 18 (citing *Doe,* 2007 ME 139, ¶ 32, 932 A.2d at 562). Chapter 570 has reduced the frequency of registrants' in-person verification requirements, such that a lifetime registrant may verify his or her information in writing quarterly and in person every five years, or when law enforcement has reason to believe his or her appearance has changed significantly; a ten-year registrant verifies in writing annually and in person every five years or when law enforcement has reason to believe his or her appearance has changed significantly. 34-A M.R.S. §11222(4-A) and (4-B) (2011). These amendments affect in-person registration requirements for those sentenced between January 1, 1982 and September 18, 1999, including the plaintiffs. *Id.*

In addition, Chapter 570 added several exceptions to the registration requirement of 34-A M.R.S. § 11202-A (2009). These amendments allow several groups of lifetime registrants to petition for removal from the registry, including (1) registrants sentenced in Maine between January 1, 1982 and June 30, 1992, who were finally discharged from the correctional system at least 10 years prior to their petition for removal; (2) registrants sentenced in Maine on or after June 30, 1992 and prior to September 18, 1999, who were finally discharged from the correctional system at least 10 years prior to their petition for removal; (3) registrants who were sentenced in another jurisdiction, were finally discharged from the correctional system at least 10 years prior to their petition for removal, and who have been in compliance with the registration duties as a resident required under subchapter 2 since September 12, 2009; and (4) registrants sentenced in Maine on or after September 18, 1999 and prior to July 30, 2004 for a violation of former Title 17A, section 252 who were finally discharged from the correctional system at least 10 years prior to their petition for removal; any of whom must not have been convicted of more

than one Class A sex offense, who must not have been convicted of a sex offense or a sexually violent offense prior to the registrable offense, and who must not have been convicted of a crime punishable by imprisonment for a term of one year or more subsequent to the registrable sex offense. 34-A M.R.S. §11202-A (2011).

The Chapter 570 modifications do significantly ease the burdens that the Law Court found punitive in *Letalien*. However, the statute continues to impose "restraints," on its registrants, albeit more "indirect" and "minor" than those at issue in *Letalien*. While the ability to seek relief from registration requirements is a boon to those who can benefit from it, many registrants cannot, including several of the plaintiffs. *Cf. Doe v. District Attorney*, 2007 ME 139, ¶ 35, 932 A.2d at 563 ("[T]he fact that a sex offender never has the ability to escape the registration requirements of the current SORNA, regardless of behavior, consequences, or contributions following the conviction, strikes us as having the capability to be excessive and as diverging from the purpose of protecting the public.").

Likewise, while a reduction in the frequency of in-person verification may lighten the onus of the verification requirement in theory, in practice, the statute still compels "registrants, under threat of prosecution, to physically appear at their local law enforcement agencies within five days of receiving a notice by mail, place[s] substantial restrictions on the movements of . . . registrants and may work an 'impractical impediment that amounts to an affirmative disability.'" *Letalien*, 2009 ME 130, ¶ 37, 985 A.2d at 18 (citing *Doe*, 2007 ME 139, ¶ 32, 932 A.2d at 562). It is thus more restrictive than the statute approved by the United States Supreme Court in *Smith v. Doe*, 538 U.S. 84, 101 (2003) ("[T]he record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act."). The provision allowing additional in-person verification requirements "if there is a reason to believe the [registrant's] appearance has changed significantly," 34-A M.R.S. §11222(4-A)(C), (4-B)(C), is also significantly intrusive. Rather than in-person verification submissions based upon a set period of time, this provision compels registrants to "physically appear at their local law enforcement agencies within five days of receiving a notice by mail" without advance notice to allow registrants to anticipate such verification procedures. *Letalien*, 2009 ME 130, ¶ 37, 985 A.2d at 18. This is a significant governmental intrusion. It may be one that is sustainable under the remaining factors of the *Mendoza-Martinez* analysis, but the "affirmative disability or

restraint" factor weighs in favor of a finding that the statute is punitive, even once Chapter 570's mitigating provisions are taken into account.

### ii. Historical interpretation as punishment

Turning to the second *Mendoza-Martinez* factor, whether retroactive application of the law has historically been regarded as a punishment *(see Mendoza-Martinez*, 372 U.S. at 168), the *Letalien* court reached two separate conclusions. First, citing *Smith v. Doe*, 538 U.S. 84, 97-99 (2003), the law court held that that "Internet posting pursuant to SORNA of 1999 is not punitive in purpose or effect." *Letalien*, 2009 ME 130, ¶ 38, 985 A.2d at 19. The Law Court then considered Maine's unique legislative history and concluded that "retroactive application of SORNA of 1999 to offenders who were sentenced on or after June 30, 1992, and before September 18, 1999, should be regarded as punishment." *Id.* at ¶ 39, 985 A.2d at 19. This conclusion was due to the fact that the versions of the sex offender registration statutes in place between June 30, 1992 and September 18, 1999, "authorized sentencing judges, as part of the sentencing process, to waive an offender's duty to register," (*id.*), whereas SORNA of 1999 eliminated this exercise of judicial discretion. *Id.* at ¶¶ 42-43, 985 A.2d at 20.

As discussed above, the state defendants argue that *Letalien*'s holding does not apply to the plaintiffs, since that case noted, "Because sex offender registration was required to be part of Letalien's criminal sentence, the retroactive application of SORNA of 1999's requirements to Letalien modified and enhanced a portion of his criminal sentence," and therefore, "the retroactive application of SORNA of 1999 makes more burdensome the punishment for a crime after its commission," ultimately finding that, "SORNA of 1999 is punitive as applied to those offenders who were originally made subject to SORA of 1991 or SORNA of 1995." *Letalien*, 2009 ME 130, ¶ 43, 985 A.2d at 20-21(quotations omitted).

The plaintiffs, however, counter that the essence of an ex post facto law is that punishment becomes more burdensome after the commission of a crime, and that therefore, their being subject to SORNA of 1999 is even more troublesome than that of Letalien and his class of registrants, since the *Letalien* class of registrants originally had some registration requirement which then became more onerous, but the plaintiffs ended up facing all of the onerous requirements of *Letalien*, with no notice that they would ever be required to meet its specifications. Or as plaintiffs state in their argument regarding lifetime registration: "For plaintiffs, the journey is not from fifteen years to lifetime but from no years to lifetime." The

plaintiffs then argue that insofar as their situation is different from Letalien's and they were not notified that there would be a registration requirement, the internet publication that was approved in *Letalien*, 2009 ME 130, ¶ 38, 985 A.2d at 19, may still be unconstitutionally ex post facto as to them.

There now appears to be a multi-jurisdictional consensus that the internet registration requirement is not punitive, even as applied to those who were not originally subject to it. *See, e.g., Smith v. Doe*, 538 U.S. at 91, 99; *A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206 (3d Cir. 2003); *Femedeer v. Haun*, 227 F.3d 1244, 1248, 1253 (10th Cir. 2000); *A.A. v. State*, 895 A.2d 453 (N.J. Super. 2006); *State v. Gragg*, 137 P.3d 461, 464-65 (Idaho Ct. App. 2005); *People v. Cornelius*, 821 N.E.2d 288, 292, 307 (Ill. 2004); *Haislop v. Edgell*, 593 S.E.2d 839, 845-46 (W. Va. 2003); *In re: W.M.*, 851 A.2d 431, 446 (D.C. App. 2004). Even if this were not the case, this court is bound by the determinations of the Supreme Court as to the Federal constitution, and of the Law Court as to the Maine Constitution, and both courts have plainly and clearly ruled that internet posting is not punitive for purposes of an ex post facto analysis. *See Smith v. Doe*, 538 U.S. at 98-99 ("In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme. . . . These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender."); *Letalien*, 2009 ME 130, ¶ 38, 985 A.2d at 19 ("[W]e conclude that Internet posting pursuant to SORNA of 1999 is not punitive in purpose or effect."). This court is bound by those determinations, which do not make a distinction based upon whether registration was part of the offender's original sentence or whether it was imposed separately and subsequent to his or her conviction.

Having rejected both the plaintiffs' argument that the Internet registration requirement is unconstitutionally ex post facto as to them and the state defendants' argument that the plaintiffs are ineligible for ex post facto protection in Maine because they were not sentenced under SORA of 1991 or SORNA of 1995, the court turns to the question of whether sex offender registration, apart from Internet registration, is historically considered punishment. *Letalien* held that retroactive registration was historically considered punishment, that is, that the second *Mendoza-Martinez* factor suggested that SORNA of 1999 was punitive as to registrants originally sentenced under either SORA of 1991 or SORNA of 1995, that is, when the registration was

ordered as part of a sex offender's sentence unless waived by judicial decree. *Letalien*, 2009 ME 130, ¶¶ 42-43, 985 A.2d at 20-21. The court notes that *Letalien* limited its analysis to the case before it in that the case only dealt with a situation in which the registration requirements of SORNA of 1999 were applied retroactively to sex offenders who were convicted and sentenced of sex crimes under either SORA of 1991 or SORNA of 1995.

Analysis of the same factor for those registrants convicted of sex offenses between 1982 and 1991 requires that the court consider more generally what the term "punishment" means for those registrants convicted and sentenced before the enactment of any registration law. *See Letalien*, 2009 ME 130, ¶ 61, 985 A.2d at 25; *cf.* P.L. 2003, ch. 771, § B-13 (eff. July 30, 2004) (codified at 17-A M.R.S. § 1152(2-C) (2006) (modifying SORNA of 1999 to remove the provision stating that registration should be ordered "as part of the sentence" and to substitute, "At the time the court imposes a sentence"). *Letalien* noted, "[W]hen sex offender registration is made a part of an offender's criminal sentence, it necessarily constitutes a part of the punishment administered by the State in response to that offender's criminal conviction." *Letalien*, 2009 ME 130, ¶ 61, 985 A.2d at 25. When the legislature first enacted sex offender registration in Maine, it enacted those requirements as part of the offender's sentence—and therefore "part of the punishment administered by the State in response to that offender's criminal conviction." *Id.* Even after the legislature had amended SORA of 1991 and SORNA of 1995, the registration requirement remained part of the offender's sentence—and thus, punishment, at least in part— until P.L. 2003, ch. 771, § B-13 (effective July 30, 2004), codified at 17-A M.R.S. § 1152(2-C) (2005). *See State v. Johnson*, 2006 ME 35, ¶ 14, 894 A.2d 489, 492. While the Legislature has since recast SORNA of 1999 as part of a civil regulatory scheme, rather than part of a sex offender's sentence, the Law Court emphasized the importance of "[t]he unique history of the development of sex offender registration laws in Maine . . . to the question of whether the retroactive application of SORNA of 1999 . . . should be regarded as punishment." *Letalien*, 2009 ME 130, ¶ 39, 985 A.2d at 19. Examination of the registry's history shows the closeness of its association with punishment. The court recognizes that the plaintiffs' connection to the "sentencing" and therefore punishment provisions of the registration scheme are slightly more attenuated than those of the *Letalien* class, who were sentenced to registration, but notes that the burdens imposed by retroactive application of SORNA of 1999 to the plaintiffs—including but not limited to the initial registration process, the quarterly written requirements, the in-person

27

verification every 5 years, and the inability to ever petition for removal from the registry—impose duties upon the plaintiffs, in perpetuity, of more that their initial sentences (or "punishment") required. "[B]ecause the purpose of the ex post facto prohibition is rightfully considered to be at its apex when a law's retroactive application is more punitive than the punishment that was actually imposed against an offender as part of a sentence," *Letalien*, 2009 ME 130, ¶ 61, 985 A.2d at 25-26, the court considers this factor to weigh in favor of a finding that the retroactive application of SORNA of 1999 to the plaintiffs is punitive.

### iii. Scienter

"The third factor asks whether the obligation to register according to SORNA is triggered only on a finding of *scienter*. In *Haskell* we concluded that it is not and that this factor supports SORNA being viewed as non-punitive." *Letalien*, 2009 ME 130, ¶ 44, 985 A.2d at 21 (citing *Mendoza-Martinez*, 372 U.S. at 168; *Haskell*, 2001 ME 154, ¶ 17, 784 A.2d at 12).

### iv. Promotion of retribution and deterrence

"The fourth factor requires consideration of whether SORNA of 1999 promotes retribution and deterrence, the traditional aims of punishment." *Letalien*, 2009 ME 130, ¶ 45, 985 A.2d at 21 (citing *Mendoza-Martinez*, 372 U.S. at 168). In *Smith v. Doe*, 538 U.S. 84, 102 (2003), the United States Supreme Court found that Alaska's SORNA was not punitive merely because the statute might deter future crimes, nor was it retributive, even though it was applied based upon the extent of the wrongdoing rather than the extent of the risk posed. In its analysis of Maine's SORNA, the law court considered this factor to be "neutral" as to its determination of whether SORNA is punitive. *Letalien*, 2009 ME 130, ¶ 46, 985 A.2d at 21. In the law court's view, the record before it provided little basis on which to assess the reasonableness of SORNA of 1999's disparate treatment categorizing some offenders as lifetime registrants and others as ten-year registrants, or on which to determine "whether Maine's requirement of lifetime registration is reasonably related to the danger of recidivism." *Id.*

This court considers that the legislative provisions of Chapter 570 help to mitigate this disparity as to offenders who are categorized as lifetime registrants based upon actions undertaken prior to the effective date of SORNA of 1999, previously given no opportunity to petition for removal from the registry, regardless of their likelihood to reoffend. The

amendments allow several groups of lifetime registrants to petition for removal from the registry, as discussed in connection with the court's analysis of whether SORNA of 1999, as amended, constitutes an affirmative disability or restraint. Those categories of registrants eligible to petition for removal from the registry have in common an absence of multiple offenses, whether sex offenses or felony offenses, and a "[final] discharge[] from the correctional system at least 10 years prior to submitting documentation to the bureau" seeking removal from the registry. 34-A M.R.S. §11202-A (2011).

While SORNA of 1999, like the Alaska statute considered in *Smith*, "differentiates between individuals convicted of aggravated or multiple offenses and those convicted of a single nonaggravated offense," *Smith*, 538 U.S. at 102, the United States Supreme "Court recognized in *Smith* that 'the broad categories, however, and the corresponding length of the reporting requirement, are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective.'" *Letalien*, 2009 ME 130, ¶ 45, 985 A.2d at 21 (quoting *Smith*, 538 U.S. at 102) (brackets omitted).

It appears that the legislature, in amending the statute to create these exceptions, was attempting to create greater congruence between a registrant's likelihood to reoffend and the registrant's lifetime registration requirement. There remain broad categories of offenders whose lifetime registration requirement is not ameliorated by these legislative categories, and who do not have an opportunity to present evidence of their non-dangerousness in order to pursue removal from the registry. However, in light of the Law Court's finding that SORNA of 1999 was neutral as to this factor when it did not allow any registrants to petition for removal, the court finds that the statute remains neutral as to its promotion of the traditional aims of punishment, retribution and deterrence.

v. Application based upon conviction of a crime

The fifth *Mendoza-Martinez* factor requires the court to consider whether the behavior to which SORNA of 1999 applies is already a crime. *Mendoza-Martinez*, 372 U.S. at 168.

> Because registration under SORNA of 1999 only applies to offenders who were convicted of specified crimes, does not arise based on individualized assessment of an offender's risk of recidivism, and cannot be waived based on proof that an offender poses little or no risk, SORNA of 1999 applies exclusively to behavior that is already a crime. It is punitive in effect in this respect.

*Letalien*, 2009 ME 130, ¶ 48, 985 A.2d at 22 (citing *Smith*, 538 U.S. at 112-13 (Stevens, J., dissenting); *Doe v. Alaska*, 189 P.3d 999, 1015 (Alaska 2008)). The Chapter 570 amendments do not alter this analysis, and so this factor continues to weigh in favor of a finding that SORNA of 1999 is punitive.

### vi. Connection to non-punitive purpose

The court next considers the sixth *Mendoza-Martinez* factor, whether SORNA of 1999 has a rational connection to a non-punitive purpose. *Mendoza-Martinez,* 372 U.S. at 168-69. The Supreme Court has intimated, in other cases, that this is the most significant question under the effects stage of the analysis: whether the law, "while perhaps having certain punitive aspects, serves important non punitive goals." *Haskell*, 2001 ME 154, ¶ 9, 784 A.2d at 9-10 (citing *United States v. Ursery*, 518 U.S. 267, 290 (1996); *Moore v. Avoyelles Corr. Ctr.*, 253 F.3d 870, 873 (5th Cir. 2001) ("The most significant question under [the effects] stage of the 'intent-effects' analysis is whether the law[,] while perhaps having certain punitive aspects, serves important nonpunitive goals.") (quotations and brackets omitted); *Russell v. Gregoire*, 124 F.3d 1079, 1091 (9th Cir. 1997), *cert. denied*, 523 U.S. 1007 (1998)); *see also Smith*, 538 U.S. at 102 ("The Act's rational connection to a nonpunitive purpose is a 'most significant' factor in our determination that the statute's effects are not punitive.") (quoting *Ursery*, 518 U.S. at 290). "There is no doubt that SORNA of 1999 serves a valid governmental purpose separate from punishment. The Legislature declared that SORNA of 1999 is intended 'to protect the public from potentially dangerous registrants by enhancing access to information concerning those registrants.'" *Letalien*, 2009 ME 130, ¶ 50, 985 A.2d 22 (quoting 34-A M.R.S. §11201 (2008)). "Protecting the public from potentially dangerous sex offenders is, without question, a compelling state interest in furtherance of the state's police powers. . . . The protection advanced by SORNA is among the most basic obligations state government owes its people--ensuring their safety." *Id.* SORNA advances these safety concerns "by alerting the public to the risk of sex offenders in their community." *Smith*, 538 U.S. at 103 (quotation omitted). This factor weighs against a conclusion that SORNA is punitive.

### vii. Proportionality in relation to non-punitive purpose

The seventh and final *Mendoza-Martinez* factor addresses whether SORNA of 1999 "appears excessive in relation to the alternative purpose assigned." *Mendoza-Martinez,* 372 U.S. at 169. "The excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith,* 538 U.S. at 105; *see also Letalien,* 2009 ME 130, ¶ 51, 985 A.2d at 22. "Reasonableness is an objective standard." *Letalien,* 2009 ME 130, ¶ 51, 985 A.2d at 22.

The law court treated this factor as neutral in its evaluation of SORNA of 1999 prior to the Chapter 570 amendments, finding that the court lacked sufficient information upon which "to gauge whether the regulatory means chosen—in particular, increasing the registration period from fifteen years [as it would have been under the prior version of SORNA] to life without the possibility of a waiver, and increasing the verification from infrequent notices to quarterly in-person reporting and fingerprinting at a police station—are reasonable in light of the law's non-punitive purpose." *Id.* at ¶ 52, 55, 985 A.2d at 23, 24. In conducting its analysis, the law court focused upon "the increased burdens resulting from SORNA of 1999's retroactive application to individuals who were originally subject to a fifteen-year registration period under SORA of 1991 or SORNA of 1995, but who are now subject to lifetime registration and quarterly in-person verification." *Id.* at ¶ 51, 985 A.2d at 22-23. The *Letalien* court balanced the registry's over-inclusiveness and the stigma that registration imparted even to those registrants who had worked to successfully rehabilitate themselves, *id.* at ¶ 53, 985 A.2d at 23-24, with the benefit to public safety of "ready access to information for a longer period regarding a group of individuals who, at least as a class of persons, pose a public safety risk," noting, "Even in the absence of individualized risk assessments of registrants, information concerning the conviction history and current whereabouts of every sex offender benefits public safety." *Id.* at ¶ 54, 985 A.2d at 24.

Despite the court's tendency to "lean toward the view that the increased regulatory scheme of SORNA of 1999 appears excessive when applied to registered offenders previously" subject to no registration requirement at all "because there is no consideration of the individual circumstances or rehabilitation of each offender," *see id.* at ¶ 55, 985 A.2d at 24, the court cannot categorically state that SORNA of 1999 is excessive or unreasonable in relation to its purpose of promoting public safety by collecting and making available already public information regarding

sex offense convictions—particularly given the slight reduction in onerousness of the registration requirements and the possibility of removal from the registry for some offenders brought about by Chapter 570. Accordingly, the court treats this factor as neutral.

> The *Letalien* court synthesized its review of the *Mendoza-Martinez* factors as follows:

> [T]he retroactive application of the lifetime registration requirement and quarterly in-person verification procedures of SORNA of 1999 to offenders originally sentenced subject to SORA of 1991 and SORNA of 1995, without, at a minimum, affording those offenders any opportunity to ever be relieved of the duty as was permitted under those laws, is punitive.

*Letalien*, 2009 ME 130, ¶ 62, 985 A.2d at 26. Because of the pains the Law Court took to distinguish those cases where registrants were subject to some of the punitive elements but not others, *see id.* at ¶ 37 n.9, 985 A.2d at 18 n.9, the court is persuaded that the Law Court found the combination of burdensome factors to be punitive in effect, rather than each factor individually. In response to *Letalien*, the legislature lightened the burden of in-person registration by making the in-person verification requirements less frequent, and offered classes of offenders an opportunity to seek removal from the registry. The overall effect of SORNA of 1999, as amended, is therefore lighter for the plaintiffs now than it was for Letalien when his case came before the Law Court, despite the fact that the plaintiffs suffered from greater surprise than Letalien by their addition to the registry. The law court's observation in *Letalien* that quarterly, in-person, lifetime registration constitutes a "substantial disability or restraint on the free exercise of individual liberty," *Letalien*, 2009 ME 130, ¶ 58, 985 A.2d at 24-25, remains valid, but the legislative amendment allowing many registrants to petition for removal from the registry lightens the impairment of liberty that the *Letalien* court found.

> It is not our role to ask whether the Legislature could achieve its goals through alternative means. Indeed, we properly exercise restraint in our review of a legislative effort to apply retroactively a civil regulatory scheme intended to address a complex public safety issue. We proceed with care so as not to interfere with innovative legislative efforts intended to advance the public interest, unless required otherwise by constitutional mandates.

*Letalien*, 2009 ME 130, ¶ 56, 985 A.2d at 24.

Whether the plaintiffs are correct as to the meaning of *Letalien*'s holding, only the Law Court can clarify. It may be that any statutory scheme must, in order to withstand constitutional scrutiny, provide offenders with an individualized opportunity to be relieved of SORNA obligations, particularly when the obligations must be endured by the offender until the day the

offender dies. In other words, it may be that the "opportunity" provided to the plaintiffs is an individualized one that must be provided to each offender, depending on how they have lived their lives after conviction. Alternatively, the Law Court may find that "opportunity" satisfied by the Legislature's determinations of classes of offenders who are eligible to be relieved of the obligations, and others who will never be eligible. SORA of 1991 and SORNA of 1995 provided opportunities for individual offenders to prove rehabilitation, as did the original version of Chapter 570—until a fiscal note became affixed to it. See L.D. 1822, Summary (124th Legis. 2010)).

However, the plaintiffs' burden here cannot be underestimated. "A statute is presumed to be constitutional and the person challenging the constitutionality has the burden of establishing its infirmity." *Letalien*, 2009 ME 130, ¶ 15, 985 A.2d at 12 (quoting *Kenny v. Dep't of Human Servs.*, 1999 ME 158, ¶ 7, 740 A.2d 560, 563). "We must assume that the Legislature acted in accord with constitutional requirements if the statute can reasonably be read in such a way, notwithstanding other possible unconstitutional interpretations of the same statute." *Id.* (quoting *Haskell*, 2001 ME 154, ¶ 4, 784 A.2d at 7). SORNA of 1999 is intended to be a "civil regulatory statute." *Id.* at ¶ 30, 985 A.2d at 16. "[A] statute that is intended to be civil will be found to be an ex post facto law only if the 'party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Id.* at ¶ 31, 985 A.2d at 16 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)).

Because the plaintiffs have not demonstrated by the clearest proof that SORNA of 1999, as amended, is punitive and therefore a criminal law, their assertion that it is an ex post facto law must fail. Their motion for summary judgment on this ground is DENIED. The state defendants' motion for summary judgment is GRANTED as to the ex post facto argument.

### III. Constitutionality of 34-A M.R.S. §11221(1)(G)

The plaintiffs argue that 34-A M.R.S. §11221(1)(G), allowing the sex offender registry to obtain "any other information the bureau determines important," might allow police to seek information that would violate the Fourth, Fifth, or Fourteenth Amendments to the Constitution of the United States and their analogues under the Maine Constitution, or be void for

vagueness. The state defendants counter that the argument is not ripe, as the statute has not been used to request any information at all, so that there is nothing for the plaintiffs to challenge.[12]

The provision to which the plaintiffs object provides: "The bureau shall establish and maintain a registry of persons required to register pursuant to this subchapter. The registry must include the following information on each registrant: . . . G. Any other information the bureau determines important." 34-A M.R.S. §11221(1)(G) (2011).

"The void-for-vagueness doctrine incorporated within due process rests on the assumption that the law must provide reasonable and intelligible standards to guide the future conduct of individuals and to allow the courts and enforcement officials to effectuate the legislative intent in applying these laws." *Shapiro Bros. Shoe Co., Inc. v. Lewiston-Auburn Shoeworkers Protective Ass'n*, 320 A.2d 247, 253 (Me. 1974); *see also Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 205 (1st Cir. 2002) ("When citizens cannot determine what conduct a law proscribes, the law's vagueness may raise constitutional due process concerns.") "A statute is void for vagueness when it sets guidelines which would force men of general intelligence to guess at its meaning, leaving them without assurance that their behavior complies with legal requirements and forcing courts to be uncertain in their interpretation of the law." *Shapiro Bros.*, 320 A.2d at 253. "Such an unacceptable statute would often be so vague and indefinite as really to be no rule or standard at all." *Id.* (quotation omitted). "The principle underlying the doctrine is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Gun Owners' Action League*, 284 F.3d at 205 (quotation omitted).

> Alleging that the Act is unconstitutionally vague, the plaintiffs complain about the threat of enforcement, but not any particular instances of enforcement. Such facial challenges raise special justiciability concerns. Particularly relevant here is the doctrine of ripeness, which "asks whether an injury that has not yet happened is sufficiently likely to happen" to warrant judicial review. 13A Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure*, ß 3531.12, at 50 (2d ed. 1984) (citing *Warth v. Seldin, 422 U.S. 490, 499 n.10, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975)* (defining ripeness inquiry as "whether the harm asserted has matured sufficiently to warrant judicial intervention.")). The requirement of ripeness is "particularly relevant in the

---

[12] The state defendants go on to distinguish the cases upon which the plaintiffs rely (*Doe v. Nebraska*, 2010 WL 3259366 (D. Neb. 2010); *Doe v. Pros., Marion County, Ind.*, 566 F.Supp.2d 862 (S.D. Ind. 2008); and *United States v. Reese*, 92 U.S. 214, 221 (1876)) but the court does not find it necessary to make this distinction in any detail, as the plaintiffs' pre-enforcement objection to the statute does not raise any concrete case or controversy and is thus not ripe for judicial consideration. *See, e.g., Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198 (1st Cir. 2002).

context of actions for preenforcement review of statutes," because it "focuses on the timing of the action." *Navegar, Inc. v. United States, 322 U.S. App. D.C. 288, 103 F.3d 994, 998 (D.C. Cir. 1997)*.

*Id.* "In determining ripeness, we apply a familiar test: 'the question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *Lake Carriers' Assn. v. MacMullan*, 406 U.S. 498, 506 (1972)). "Nevertheless, threats of enforcement of a vague statute can support a facial challenge to a statute when certain conditions are met." *Id.* at 206. "To determine whether the threat of enforcement of an allegedly vague statute is ripe for judicial review, we examine 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

"'Fitness typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed, whereas hardship typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties.'" *Id.* (quoting *Rhode Island Ass'n of Realtors, Inc., v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999)). "In all of the vagueness counts, the main hardship alleged by the plaintiffs is the threat of prosecution. A threatened prosecution is only immediate enough to satisfy the hardship prong of the ripeness inquiry when 'the challenged action creates a 'direct and immediate' dilemma for the parties.'" *Id.* (quoting *W.R. Grace & Co. v. United States Envtl. Prot. Agency*, 959 F.2d 360, 364 (1st Cir., 1992)).

> Such a dilemma exists when threatened prosecution puts the party seeking preenforcement review between a rock and a hard place—absent the availability of preenforcement review, [they] must either forego possibly lawful activity because of [their] well-founded fear of prosecution, or willfully violate the statute, thereby subjecting [themselves] to criminal prosecution and punishment.

*Id.* (quotation omitted).

The plaintiffs' claim fails at this point. There is no threatened prosecution. The plaintiffs allege that the immediate hardship they suffer is the authority provided to bureau to request information and publicize it, which "could present Fourth or Fifth Amendment issues." (Reply Memo. of Mitchell Firm Pls. and Opp. to State Defs. Cross-Mot. for Summ. J. at 17.) The bureau has not requested any such information. At the time that the bureau requests information to which it, arguably, is not constitutionally entitled, then the plaintiffs' pre-enforcement

challenge may conceivably be ripe. At this time, when the bureau has not requested any information to which they are even arguably not entitled, there is no "direct and immediate" dilemma for the parties. There is no lawful activity they must forgo to avoid prosecution; nor is there any way in which they could willfully violate the statute and incur prosecution. The challenge is therefore not ripe for review.[13]

Even if this point did not conclude the court's analysis in favor of the state defendants, the court would point out the second dimension of the analysis likewise does not support the plaintiffs' contention. "The fitness component of ripeness addresses whether the factual and legal dimensions of the challenge to the Act are developed enough to permit adjudication of the plaintiffs' claim." *Id.* at 207-208. The First Circuit noted in *Gun Owners' Action Association* that the statute at issue in that case "empowers an agency of the Commonwealth . . . to promulgate regulations clarifying its meaning and to publish a list of weapons proscribed by the statute" (*id.* at 208), thereby reducing the vagueness that was the subject of the plaintiffs' attacks on the statute. Likewise, in this case, the statute allows the bureau to request additional information that "it determines important" from registrants; the information will not be collected in the absence of a statement of what information the bureau finds important, thereby clarifying the vagueness the plaintiffs find objectionable.

The court cannot find 34-A M.R.S. §11221(1)(G) (2011) unconstitutional at this time, so the plaintiffs' motion for summary judgment seeking such a judgment is DENIED; the state defendants' motion for summary judgment on this count is GRANTED.

## IV. Equal protection

"The Equal Protection Clause of the Fourteenth Amendment forbids any state from denying 'to any person within its jurisdiction the equal protection of the laws,' U.S. CONST. amend. XIV, § 1, and requires, generally, that persons similarly situated be treated alike." *Anderson v. Town of Durham*, 2006 ME 39, ¶ 29, 895 A.2d 944, 953 (citing *Plyler v. Doe*, 457

---

[13] The plaintiffs' reference to *Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999) is unavailing. In that case, the Sixth Circuit noted, the "statute is written in such a manner that the release of registry information can take place at any time law enforcement officials have determined that release is necessary to protect the public." *Cutshall*, 193 F.3d at 472. Here, law enforcement does not have the information at its disposal; the greatest risk to the plaintiffs that the statute would allow would be for the bureau to request information from the registrants, at which point they could bring a challenge which would then be ripe.

U.S. 202, 216, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982)). Article I, § 6-A of the Maine Constitution likewise provides, "No person shall be . . . denied the equal protection of the laws, nor be denied the enjoyment of that person's civil rights or be discriminated against in the exercise thereof." The protections of the state and federal constitutional provisions are coextensive. *Town of Frye Island v. State*, 2008 ME 27, ¶ 14, 940 A.2d 1065, 1069.

> If government action that is challenged on equal protection grounds infringes on a fundamental constitutional right, or involves an inherently suspect classification such as race, it is subject to analysis under the strict scrutiny standard. *Sch. Admin. Dist. No. 1 v. Comm'r, Dep't of Educ., 659 A.2d 854, 857 (Me. 1995)*. Strict scrutiny requires that the challenged action be narrowly tailored to achieve a compelling governmental interest. *See Butler v. Supreme Judicial Court, 611 A.2d 987, 992 (Me. 1992)*. If the government action does not implicate either a fundamental right or a suspect class, "different treatment accorded to similarly situated persons need only be rationally related to a legitimate state interest." *Sch. Admin. Dist. No. 1, 659 A.2d at 857*. When a statute is reviewed under the rational basis standard, it bears a strong presumption of validity. *See id.* Under the rational basis standard, the burden is on the party challenging the government action to demonstrate that "there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." *Eulitt [v. State of Me., Dep't of Educ., 386 F.3d 344, 356 (1st Cir. 2004)]*.

*Anderson*, 2006 ME 39, ¶ 29, 895 A.2d at 953-54.

Sex offenders are not a suspect class. *Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005) (citing *United States v. LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001)). Nor do the various subclassifications among sex offenders, which the plaintiffs point to as unsustainable because of their diverging responsibilities and opportunities to petition for removal under SORNA of 1999, as amended, implicate a suspect class. Therefore, in order to determine whether to apply strict scrutiny or rational basis review, the court must analyze whether the plaintiffs have pled the existence of a fundamental right. They do not allege a fundamental right in their equal protection arguments, but they do so argue in their substantive due process line of reasoning. In order to avoid disrupting that analysis, the court will leave it under the heading where the plaintiffs have pled it, but for the purposes of our equal protection analysis, it suffices to state that the court has not found a fundamental right to be at issue. The court's assignment of rational basis review to this issue is bolstered by the fact that the Law Court has held, "Only classifications involving a suspect or quasi-suspect class, or impacting certain fundamental constitutional rights, are subject to heightened scrutiny. Other classifications, like those

presented by SORNA, need only be rationally related to a legitimate government goal." *State v. Haskell*, 2001 ME 154, ¶ 16 n.10, 784 A.2d at 11 n.10 (citations omitted). Since "the government action does not implicate either a fundamental right or a suspect class, different treatment accorded to similarly situated persons need only be rationally related to a legitimate state interest." *See Anderson*, 2006 ME 39, ¶ 29, 895 A.2d at 953.

"[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe*, 509 U.S. 312, 319 (1993) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). "For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Id.* "Such a classification cannot run afoul of the *Equal Protection Clause* if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* (citing *Nordlinger v. Hahn,* 505 U.S. 1, 11 (1992); [*New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) *(per curiam)*].

"Further, a legislature that creates these categories need not 'actually articulate at any time the purpose or rationale supporting its classification.'" *Id.* (quoting *Nordlinger*, 505 U.S. at 15). *See also, e. g., United States Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 179, 66 L. Ed. 2d 368, 101 S. Ct. 453 (1980); Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528, 3 L. Ed. 2d 480, 79 S. Ct. 437 (1959).* "Instead, a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (quoting *Beach Commc'ns*, 508 U.S. at 313. Further, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Beach Commc'ns*, 508 U.S. at 314. And since courts "never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature," and "the absence of legislative facts explaining the distinction on the record has no significance in rational-basis analysis." *Id.* at 315 (quotations and citations omitted).

Because "[a] statute is presumed constitutional, . . . and 'the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record," the court looks to the plaintiffs' arguments to determine whether they have successfully shown that there is absolutely no

conceivable basis to support the distinctions the legislature has drawn. *Heller*, 509 U.S. at 320-21 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). The plaintiffs allege "several suspect inequalities," including "the fact of registration vs. non-registration for the Does previously all treated alike before ch. 570; [and] the difference between ten year and lifetime registrants; sex offenders generally vs. other perpetrators of heinous crimes." (Reply Memo. of Mitchell Firm Pls. and Opp. to State Defs. Cross-Mot. for Summ. J. at 18.) They also point to a submission by their expert, Dr. Brian Rines, which they allege supports a finding that the legislative categories do not predict dangerousness. (Memo. of Mitchell Firm Pls. at 8.) The plaintiffs' memo also includes a version of their ex post facto argument regarding the arbitrariness of treating pre-1991 convictions as harshly as or more harshly than those registrants for whom *Letalien* provided relief, which argument the court need not address after the extensive consideration given to both parties' ex post facto arguments above. The plaintiffs also argue that the law is not narrowly tailored, in that the plaintiffs fall into different categories with no discernable justification, and that the category into which a registrant falls could easily be a matter of prosecutorial discretion: "Particularly if all charges relate to a single incident, possibly repeated, the prosecutor could bargain them down to one to secure a guilty plea. Thus one's duty to register may devolve to luck or accident." (Memo. of Mitchell Firm Pls. at 9.)

The court can comfortably reject all of the plaintiffs' arguments save the last. However, his opinion does not "negative every conceivable basis" for the legislative distinctions among and between registrants. Given the proper deference, almost all of the legislature's distinctions, including those between sex offenders and other forms of criminals,[14] easily withstand rational basis review.

As to the argument regarding offenders whose status as lifetime registrants, even after the modifications of Chapter 570, arose from multiple pre-SORA or SORNA convictions which may have arisen from a single incident, however, the court has serious reservations as to whether the law would rational basis review. *Cf. State v. Heald*, 382 A.2d 290, 301 (Me. 1978) ("It is well established that a reasonable prosecutorial discretion in the enforcement of criminal laws is inherent in our criminal justice system . . ."). Were any of the plaintiffs participating in this motion for summary judgment unable to petition for termination of the registration requirements

---

[14] *See, e.g., McKune v. Lile*, 536 U.S. 24, 33 (2002) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault. See Sex Offenses 27; U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997)).

because of multiple convictions, which convictions stemmed from the same transaction, that would potentially present a level of arbitrariness sufficient to provide the extraordinary case on which a law may not withstand rational basis review. If two identical offenders committed identical crimes, but one district attorney charged every incident of an interaction separately, for example, charging for each incident of penetration, or for the sexual contact leading up to that point, and the other district attorney charged once for the overall occurrence, then the two offenders would have significantly different possibilities for removal from the registry under SORNA of 1999, as amended. That difference of registration effect for two identical crimes might be unsustainable, as it does not bear a rational relationship to the state's legitimate interest of protecting the public and increasing awareness regarding convicted sex offenders. Because SORNA of 1999, as amended, does not provide for individualized review of registrants' dangerousness or even their underlying convictions, there is a the potential for an equal protection violation under a different case or cases.

However, the plaintiffs have not presented the court with such a case as would implicate these concerns. While Doe V pled guilty to two counts of unlawful sexual contact in 1993[15], it appears that he will be able to petition for termination of his registration requirements once the required ten-year period following his probation has passed, which the State suggest will be in 2012. 34-A M.R.S. §11202-A(1)(A) (2011). The court agrees with the plaintiffs that it is the retroactive lifetime quality of the registration requirements that triggers further review (*see* the court's analysis of the plaintiffs' claims under Maine's Declaration of Rights, below). The other plaintiffs' records reveal either that their convictions stemmed from multiple incidents, or their record reflects other disqualifications that would prevent them from seeking termination of their registration requirements pursuant to §11202-A.

Therefore, since neither a fundamental right nor a suspect class is implicated, and since none of the plaintiffs has shown that SORNA of 1999, as amended, has established "different treatment accorded to similarly situated persons" which is not "rationally related to a legitimate state interest," *see Sch. Admin. Dist. No. 1*, 659 A.2d at 857, the plaintiffs' equal protection

---

[15] Although SORA of 1991 was in effect at the time, it only required registration for a very small class of crimes, not including the crimes to which Doe V pled. He was required to register by the 2001 amendments to SORNA of 1999. *See* P.L. 2001, ch. 439, ß OOO-7 (effective Sept. 21, 2001) (codified at *34-A M.R.S.A. ß 11202* (Supp. 2001)).

claims must fail. The plaintiffs' motion for summary judgment is DENIED; the state defendants' motion for summary judgment is GRANTED.

## V. Void for vagueness

The plaintiffs allege that Chapter 570's modifications to the verification procedures for registrants sentenced between 1982 and 1999, intended to alleviate the quarterly in-person verification requirements found unconstitutionally punitive in *Letalien*, 2009 ME 130, ¶¶ 37, 62, 985 A.2d 4, 18, 26, are void for vagueness and may indeed require more frequent intrusions into registrants' lives than the statute held unconstitutional in *Letalien*. The state defendants disagree.

The provisions at issue, 34-A M.R.S. §§11222(4-A)(C) and 11222(4-B)(C), are substantially similar, save that the provision of sub-section 4-A applies to ten-year registrants and sub-section 4-B applies to lifetime registrants. The provision states:

> In lieu of mailing the completed verification form under paragraph B, the . . . registrant shall take the completed verification form and a current photograph of the . . . registrant to the law enforcement agency having jurisdiction once every 5 years after the anniversary of the . . . registrant's initial registration or, if there is a reason to believe the [offender's] [lifetime registrant's][16] appearance has changed significantly, the law enforcement agency having jurisdiction or the bureau may instruct the . . . registrant in writing:
> 1) To appear in person at the law enforcement agency having jurisdiction with a current photograph or to allow a photograph to be taken; or
> 2) If authorized in writing by the law enforcement agency having jurisdiction for the bureau, to submit a new photograph without appearing in person.

34-A M.R.S. §§11222(4-A)(C); (4-B)(C) (2011).

The state defendants assert that the plaintiffs lack standing to bring a void for vagueness challenge to this statute as to §11221(1)(G), in that none of the plaintiffs have been subject to enforcement under this statute or have been required to verify their appearances more frequently than every five years under the provision cited above. They cite *State v. Witham*, 2005 ME 79, ¶11, 876 A.2d 40, 43 (quotations omitted), for the proposition that, "In response to a void for vagueness challenge, the sufficiency of the language of [a] statute is properly tested in the circumstances of the case at bar," and that the sufficiency of this statute thus cannot be tested by

---

[16] 34-A M.R.S §11222(4-A)(C) contains the word "offender"; 34-A M.R.S. §11222(4-B)(C) uses the term "lifetime registrant."

these plaintiffs, as they have not been arrested under it. The court disagrees. Unlike in the case of §11221(1)(G), here the plaintiffs' contentions are ripe for review.

The court notes once again that "threats of enforcement of a vague statute can support a facial challenge to a statute when certain conditions are met." *Gun Owners' Action League*, 284 F.3d at 206. "To determine whether the threat of enforcement of an allegedly vague statute is ripe for judicial review, we examine 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "'Fitness typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed, whereas hardship typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties.'" *Id.* (quoting *Rhode Island Ass'n of Realtors, Inc., v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999)).

Unlike the plaintiffs' challenge to the provision granting the bureau authority to request additional information it deems necessary, which objection was based upon the risk of prosecution in case of noncompliance with potentially unconstitutional demands by the bureau, here, the plaintiffs' allegations of hardship are based upon the statute's grant to law enforcement of the power to require frequent in-person verification. The court did not have any evidence of what theoretical information requests permitted by §11221(1)(G) might be contemplated; this court noted that the seeking of constitutionally inappropriate information might trigger review provisions. In contrast to that uncertainty, §11222(4-A)(C) and (4-B)(C) do state the powers granted to law enforcement, namely, to require registrants to submit to in-person verification procedures upon a reasonable belief that the registrant's appearance has significantly changed. Also unlike the theoretical information requests under $11221(1)(G), in-person verification every ninety days has already been held unconstitutionally punitive for registrants sentenced between 1982 and 1999 in the absence of an opportunity to seek removal from the registry. *See Letalien*, 2009 ME 130, ¶¶37, 62, 985 A.2d 4, 18, 26. The court thus turns to the merits of the void-for-vagueness analysis.

"The *Due Process Clause of the Fifth Amendment to the United States Constitution* and *Article I, section 6-A of the Maine Constitution* require that criminal defendants be given 'fair notice of the standard of conduct to which they can be held accountable.'" *State v. Witham*, 2005 ME 79, ¶7, 876 A.2d 40, 42 (quoting *State v. Weeks*, 2000 ME 171, ¶7, 761 A.2d 44, 46)

(brackets omitted). "To satisfy due process, 'a penal statute must define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling v. United States*, ___ U.S. ___, ___, 130 S. Ct. 2896, 2927-28, 177 L. Ed. 2d 619, 656 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)) (brackets omitted). "A statute is unconstitutionally vague when it fails to define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Witham*, 2005 ME 79, ¶7, 876 A.2d at 42 (quotations omitted). "A statute may be void for vagueness when people of common intelligence must guess at its meaning." *Id.*

The plaintiffs' challenge thus appears to target the second half of the vagueness analysis, arguing that the statute may lead to "arbitrary and discriminatory enforcement" and potentially frequent in-person verification of law-abiding registrants.

However, the court notes that "[i]n examining the sufficiency of statutory language, 'objective quantification, mathematical certainty, and absolute precision are not required.'" *Id.* (quoting *Town of Baldwin v. Carter*, 2002 ME 52, ¶7 n.2, 794 A.2d 62, 66). "In light of the fundamental precept that we will, if possible, construe statutes 'so as to avoid a danger of unconstitutionality, . . . legislation should not be held invalid on the ground of uncertainty if susceptible of any reasonable construction that will support it.'" *Id.* (quoting *State v. Davenport*, 326 A.2d 1, 5-6 (Me. 1974)) (brackets omitted).

In light of the requirement that the court avoid invalidating a statute as unconstitutional as long as the statute is "susceptible of any reasonable construction that will support it" *Witham*, 2005 ME 79, ¶7, 876 A.2d at 42 (quotations omitted), the court is unpersuaded by the plaintiffs' assertion that the statute is unconstitutionally vague because it fails to clarify the "reason to believe," and who might have the reason, how he or she might report it, or to where. Rather, the court finds that the plain language of the statute charges the "law enforcement agency having jurisdiction or the bureau" with determining whether the evidence provided, by tip or otherwise, constitutes "reason to believe" that the registrant's "appearance has changed significantly," in which case that law enforcement agency or the bureau may instruct the registrant to provide evidence of his or her current appearance, whether in person or by sending an updated photograph. 34-A M.R.S. §§11222(4-A)(C); (4-B)(C).

"[R]easonable grounds to believe . . . must depend upon the totality of the circumstances and include consideration of not only the nature and specificity of available information but also the credibility of the source of that information and the basis of the source's knowledge." *In re Trever I*, 2009 ME 59, ¶24, 973 A.2d 752, 759 (quotation omitted) (discussing "reason to believe" in the context of the Indian Child Welfare Act of 1978); *see also State v. Vaughan*, 2009 ME 63, ¶¶11-12, 974 A.2d 930, 933-34 (admitting evidence that the arresting "officer had an objective, reasonable belief, under the totality of the circumstances," that the defendant was in violation of the law, and providing that even an anonymous tip may be a reliable basis for an officer's reasonable belief if the officer corroborates the tip through verifying "details such as the physical description and location of the suspect") (quotation omitted). *See also Terry v. Ohio*, 392 U.S. 1, 27 (1968) (allowing "stop and frisk" based on law enforcement officer's reasonable belief of danger); *cf. Kolender v. Lawson*, 461 U.S. 352, 360-61 (1983) (comparing objective standard of *Terry* with unconstitutionally vague statutory provision which would allow police to detain a person pending the person's submission of "credible and reliable" identification to the officer's satisfaction).

Law enforcement and related agencies in Maine are frequently entrusted with decision-making under the "reason to believe" or "reasonable belief" standard. *See, e.g.*, 4 M.R.S. § 960 (2011) ("Whenever the Attorney General has reason to believe that a person in the State has engaged in or is engaging in activities that violate this section, the Attorney General may initiate an action in the Superior Court to enforce this section."); 5 M.R.S. §4660-A (2011) ("Whenever a law enforcement officer has reason to believe that a person has been a victim of harassment, the officer shall immediately use all reasonable means to prevent further harassment"); 17-A M.R.S. §303 (2011) ("For purposes of this subsection, 'reasonable belief a child has been taken, retained or enticed in violation of this section' includes, but is not limited to, a determination by a law enforcement officer, based on the officer's review of the terms of a certified copy of the most recent court decree granting custody of the child, that the parent who is exercising control over the child is not the person authorized to have custody under terms of the decree."); 19-A M.R.S. § 2203 (2011) (permitting the Department of Health and Human Services to issue an order to seize and sell real property in order to satisfy a support lien, which carries the same effect as a writ of execution from the District Court or the Superior Court, as long as the department "know[s] or ha[s] reason to believe the obligor has a substantial ownership interest in

the property identified in the order"); 22 M.R.S. §2159 (2011) ("Whenever a duly authorized agent of the Commissioner of Agriculture, Food and Rural Resources finds or has reason to believe that any food is adulterated, or so misbranded as to be dangerous or fraudulent, within the meaning of this subchapter, he may issue an order . . . "); 22 M.R.S. § 2519-A (2011); 25 M.R.S. § 3501 (2011) ("This chapter shall apply to all personal property of which possession is transferred to a police department or other law enforcement agency of the State or any political subdivision thereof, under circumstances supporting a reasonable belief that such property was abandoned, lost or stolen, or otherwise illegally possessed . . ."); 24-A M.R.S. § 2101 (2011) ("If the superintendent has reason to believe that any insurer or other person is acting in violation of this section or section 404, the superintendent shall commence proceedings in accordance with sections 12-A and 404."); 26 M.R.S. § 777 (2011) ("Whenever there is reason to believe that a work permit was improperly signed, the director, deputy director or agent shall notify the local superintendent of schools of the place in which the certificate was signed."); 35-A M.R.S. § 3203 (2011) ("If the commission has reason to believe that any competitive electricity provider or transmission and distribution utility has violated any provision of law for which criminal prosecution is provided and would be in order or any antitrust law of this State or the United States, the commission shall notify the Attorney General. The Attorney General shall promptly institute any actions or proceedings the Attorney General considers appropriate.").

The statutory provision charging the law enforcement agency with jurisdiction over the registrant or the bureau itself with verifying the registrant's appearance if there is reason to believe his or her appearance has changed thus meets the constitutional due process requirement of "'fair notice of the standard of conduct to which they can be held accountable.'" *State v. Weeks*, 2000 ME 171, ¶7, 761 A.2d 44, 46 (quoting *United States v. Robinson*, 137 F.3d 652, 653 (1st Cir. 1998)). The plaintiffs do not challenge the public policy underlying this provision—to ensure that those seeking to identify convicted offenders have access to accurate depictions of them. The legislature's limitation of the verification requirement to those appearance changes which are "significant" both serves to support that public policy, in that it ensures that a registrant's photo will be updated when his or her appearance has changed to the extent that he or she would be difficult to recognize from the former photo, and serves as a limitation against arbitrary enforcement, requiring registrants to verify their appearances based on minimal changes. The court therefore finds that the statute is sustainable against a vagueness

challenge as it "'define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Weeks*, 2000 ME 171, ¶ 7, 761 A.2d 44, 46 (quoting *Kolender v. Lawson*, 461 U.S. at 357). The plaintiffs' motion for summary judgment to the contrary is therefore DENIED, while the state defendants motion for summary judgment on this count is GRANTED.

## VI. Procedural due process

The plaintiffs assert that the registration requirements of SORNA of 1999, as amended, violate their procedural due process rights because they lacked "notice of the issues, an opportunity to be heard, the right to introduce evidence and present witnesses, the right the respond to claims and evidence, and an impartial fact-finder" prior to their placement on the registry. *See In re Chelsea C.*, 2005 ME 105, ¶16, 884 A.2d 97, 102 (listing requirements of due process where significant rights are at stake).

This question has been settled by the United States Supreme Court in *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003). There, the Court held that, "even assuming, arguendo, that [the registrant] has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material under the Connecticut statute," and that "the fact that [the registrant] seeks to prove – that he is not currently dangerous – is of no consequence under Connecticut's [sex offender registration and notification] Law," because "the law's requirements turn on an offender's conviction alone – a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest." *Conn. Dep't of Pub. Safety*, 538 U.S. at 7. Because Maine's constitutional due process protections are coextensive with those of the federal constitution, *see, e.g.*, *Botting v. Dep't of Behavioral & Developmental Servs.*, 2003 ME 152, ¶23, 838 A.2d 1168, 1176, this is dispositive of the court's analysis.

The plaintiffs' attempts to argue that additional process is due because SORNA of 1999, as amended, implies that registrants are currently dangerous is unavailing. They cite *State v. Briggs*, 199 P.3d 935, 946 (Utah 2008) for the proposition that an implication of current dangerousness requires a due process hearing—but in fact, that case supports the court's analysis that no such process is due. In *Briggs*, the court ruled:

> As to Briggs's procedural due process argument, we hold that the provisions of
> the registration statute requiring him to register and requiring the DOC to publish

> information related to his prior convictions, current address, appearance, and
> other similar information do not violate his right to procedural due process. . . .
> However, we hold that the provision in the registration statute that requires the
> DOC to publish his primary and secondary targets, implying that he is currently
> dangerous, violates his right to procedural due process unless the DOC provides
> him with notice and an opportunity to be heard as to whether he is currently
> dangerous.

*Briggs*, 199 P.3d at 938. This case supports the distinction that many courts have made,

including the United States Supreme Court in *Connecticut Department of Public Safety*, between

statutes which require registration based solely upon the fact of conviction, and those which

contain a finding of dangerousness. *See, e.g., Montana v. Samples*, 198 P.3d 803, 808 (Mont.

2008) (distinguishing *Connecticut Department of Public Safety* because "[i]n Montana, facts

other than conviction are used to make the designation, and the designation leads to varying

requirements for an offender"); *State v. Guidry*, 96 P.3d 242, 251-52 (Haw. 2004) ("The

Supreme Court's due process analysis highlights a seeming distinction between Connecticut's

registration statute and the Hawai'i registration statute."); Noble v. Bd. of Parole & Post-Prison

Supervision, 964 P.2d 990, 995-96 (Or. 1998) (finding that determination that a person is a

predatory sex offender implicates a liberty interest, reasoning that when an agency gathers and

synthesizes evidence in making such a determination the interest of the person to be labeled goes

beyond mere reputation and includes an interest in avoiding ostracism, loss of employment

opportunities, and likely verbal or even physical harassment).[17] The plaintiffs' attempt to

distinguish *Connecticut Department of Public Safety* on the ground that the statutory purpose of

SORNA of 1999, as amended, implies a finding of dangerousness on the part of its registrants

because the statute provides, "The purpose of this chapter is to protect the public from potentially

dangerous registrants and offenders by enhancing access to information concerning those

registrants and offenders," 34-A M.R.S. §11201 (2011), has already been addressed and struck

---

[17] The plaintiffs' emphasis on the necessity of a hearing for lifetime registrants appears to be an implicit reference to *State v. Guidry*, 96 P.3d 242 (Haw. 2004), which held "that the lifetime registration component of the Hawai'i sex offender registration statute implicates a protected liberty interest under the *Hawai'i State Constitution, article I, section V* and requires that minimum requirements of due process—notice and the opportunity to be heard—be afforded to convicted sex offenders." *Id.* at 244. The court noted that it had "provided broader due process protection under the Hawai'i Constitution" *id.* at 251, and that due process required the opportunity to present evidence "material to a state's statutory scheme and we independently hold so under the Hawai'i Constitution." *Id.* The *Guidry* analysis therefore does not guide this court, as the Law Court has explicitly held that the Maine Constitution does not afford greater due process protections than the Constitution of the United States. *See, e.g., State v. Millikin*, 2010 ME 1, ¶16, 985 A.2d 1152, 1157-58.

down by the Sixth Circuit in *Fullmer v. Michigan Department of State Police*, 360 F.3d 579 (6th Cir. 2004).  In that case,

> the plaintiff point[ed] to a provision in the Michigan registration act to the effect that "the legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people" and that "the registration requirements of this act are intended to provide law enforcement and the people an effective means to monitor those persons who pose such a potential danger." Mich. Comp. Laws ß 28.721a (2003). He contend[ed] that this language in the statute, even though it did not appear in the information presented on the website, deprive[d] him of his "constitutionally protected interest in not being falsely labeled as a dangerous sex offender" and [would be] sufficient to invalidate the act despite the holding in *Connecticut Department of Public Safety v. Doe*.

*Fullmer*, 360 F.3d at 582 (ellipses omitted).  The Sixth Circuit rejected this argument, noting, "Regardless of the language in the statute, the information on the registry's website makes it clear to anyone accessing the registry that all sex offenders convicted after a certain date are listed, without exception," and that "there is nothing on the website to indicate that the state has made an individual determination as to a registrant's dangerousness." *Id.*  Likewise, there is nothing on Maine's Sex Offender Registry website that indicates that the state has made an individual determination of a registrant's dangerousness.  On the contrary, the disclaimer on the website, highlighted in yellow in a text box above the button that a reader would click to search the registry, reads as follows:

> The information provided on this web site is intended to be used for public safety and community awareness purposes only. The Maine State Bureau of Identification has not considered or assessed the specific risk of re-offense with regard to any individual prior to his or her inclusion on this web site and has made no determination that any individual included on this web site is currently dangerous. Individuals included on the web site are included solely by virtue of their conviction record and Maine state law. The primary purpose of providing this information is to make the information easily available and accessible, not to warn about any specific individual. Use of this information to threaten, intimidate, or harass any registrant or any other person may result in criminal prosecution.

Maine Sex Offender Registry Online Search Service, Me. State Police web site (visited July 31, 2011).  Although the statute recognizes that the registrants are "potentially dangerous," *cf. Conn. Dep't of Pub. Safety*, 538 U.S. at 4 ("Sex offenders are a serious threat in this Nation . . . and when convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sex assault") (quotations and citations omitted), the

public searching the registry is clearly informed that registration is not based on a finding of dangerousness, or any criteria apart from conviction.

Because dangerousness is not a consideration under Maine's statute, SORNA of 1999, as amended, does not fall afoul of procedural due process protections. The plaintiffs' motion for summary judgment on this ground is accordingly DENIED, while the state defendants' motion is GRANTED.

## VII. Substantive due process

The plaintiffs also assert that the application to them of SORNA of 1999, as amended, violates their rights to substantive due process, a question specifically left open in *Connecticut Department of Public Safety v. Doe*. They argue that privacy is a fundamental right, which extends, in Maine, to the acquisition and possession of property and the pursuit of happiness. Because SORNA of 1999, as amended, infringes on these rights through its interference with the plaintiffs' employability and is not narrowly tailored, they assert that it fails strict scrutiny and is unconstitutional.

The Law Court has established a three-part test to determine whether a statute is invalid because it infringes upon due process rights.[18]

> The requirements of due process in the exercise of the State's police power are as follows:
> 1. The *object* of the exercise must be to provide for the public welfare.
> 2. The legislative *means* employed must be appropriate to the achievement of the ends sought.
> 3. The *manner of exercising* the power must not be unduly arbitrary or capricious.
> In order to successfully challenge the constitutionality of a statute on due process grounds, a party "must establish the complete absence of any state of facts that would support the need for its enactment."

*Aseptic Packaging Council v. State*, 637 A.2d 457, 461 (Me. 1994) (quoting *State v. Eaton*, 577 A.2d 1162, 1165-66 (Me. 1990)) (brackets omitted); *see also State v. Haskell*, 2008 ME 82, ¶¶ 5-6, 955 A.2d 737, 739.

1. Object of the exercise

---

[18] Article I, Section 6-A of the Maine Constitution provides in pertinent part, "No person shall be deprived of life, liberty or property without due process of law . . . ."

In applying this test, the court first examines the objective of SORNA of 1999. "The purpose of [SORNA of 1999] is to protect the public from potentially dangerous registrants and offenders by enhancing access to information concerning those registrants and offenders." 34-A M.R.S. § 11201 (2009). The first requirement of the due process test therefore supports the statute's validity.

2. Legislative means employed

In evaluating the second factor of the test, the propriety of the legislative means in light of the ends sought and the process alleged to be due, the court considers federal jurisprudence under the Fourteenth Amendment to the U.S. Constitution.[19] "[F]ederal and Maine due process rights are coextensive." *State v. Milliken*, 2010 ME 1, ¶ 16, 985 A.2d 1152, 1157-58.

> Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest.

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotations and citations omitted). "[T]he Fourteenth Amendment forbids the government to infringe 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id.* at 721 (quotations, emphasis and ellipses omitted). Thus, "by establishing a threshold requirement—that a challenged state action implicate a fundamental right—before requiring more than a reasonable relation to a legitimate state interest to justify the [legislative] action, it avoids the need for complex balancing of competing interests in every case." *Id.* at 722.

The fundamental rights that have been upheld by the Supreme Court as "liberty" interests protected by the Due Process Clause include, "in addition to the specific freedoms protected by the Bill of Rights," *Washington*, 521 U.S. at 720, "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* (citing *Loving v. Virginia*, 388 U.S. 1 (1967), *Skinner v.*

---

[19] The Fourteenth Amendment to the U.S. Constitution provides in pertinent part, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

*Oklahoma ex rel. Williamson,* 316 U.S. 535 (1942), *Meyer v. Nebraska,* 262 U.S. 390 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925), *Griswold v. Connecticut,* 381 U.S. 479 (1965), *Eisenstadt v. Baird,* 405 U.S. 438 (1972), *Rochin v. California,* 342 U.S. 165 (1952), *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 851 (1992)). Courts must take care in interpreting assertions of fundamental rights; the Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Id.* (quotations omitted). "By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." *Id.* "We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court," rather than the elected legislature. *Id.* (quotations and citations omitted).

The court's review of whether the legislative means are appropriate to the achievement of the ends sought accordingly depends upon whether the asserted right is a fundamental right, in which case the legislation requires more than a "reasonable relation to a legitimate state interest" to withstand a due process challenge. The court should "analyze a substantive due process claim by first crafting a careful description of the asserted right." *Doe v. Moore,* 410 F.3d 1337, 1343 (11th Cir. 2005) (quotations omitted). "Second, [the court] must determine whether the asserted right is "one of those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."' *Id.* (quoting *Williams v. Attorney Gen. of Alabama,* 378 F.3d 1232, 1239 (11th Cir. 2004), *cert. denied, Williams v. King,* [543 U.S. 1152] (2005)).

"'Substantive due process' analysis must begin with a careful description of the asserted right, for 'the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" *Reno v. Flores,* 507 U.S. 292, 302 (1993) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125 (1992)). The "fundamental rights" that the plaintiffs assert are the right to privacy and the pursuit of happiness, and potentially reputation, under New Jersey's interpretation of a similar constitutional provision. "Despite [the plaintiffs'] broad framing of their rights in this case, however, we must endeavor to create a more

careful description of the asserted right in order to analyze its importance." *Doe v. Moore*, 410 F.3d at 1343. "Although the Supreme Court has recognized fundamental rights in regard to some special liberty and privacy interests, it has not created a broad category where any alleged infringement on privacy and liberty will be subject to substantive due process protection." *Id.* at 1343-44. The court finds that the specific right the plaintiffs seek is the right of a person, convicted of one or more sex-based offenses, to refuse subsequent registration of his or her personal information with Maine law enforcement and prevent publication of such information on Maine's Sex Offender Registry website. *See id.* at 1344.

Having determined this narrow description, the court next asks whether this right is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id., see also Green v. Comm'r of Mental Health & Mental Retardation* (quoting *Washington*, 521 U.S. at 720-21). Other courts which have evaluated this question concluded that it was not such a right. See, e.g., *Doe v. Moore*, 410 F.3d at 1345 ("[W]e can find no history or tradition that would elevate the issue here to a fundamental right. In fact, the case law we have found supports the contrary conclusion."); *Doe v. Tandeske*, 361 F.3d 594, 597 (9th Cir. 2004) (per curiam) ("[P]ersons who have been convicted of serious sex offenses do not have a fundamental right to be free from . . . registration and notification requirements."); *Gunderson v. Hvass*, 339 F.3d 639, 643 (8th Cir. 2003) (sex offender registration statute did not infringe the fundamental right to a presumption of innocence; *Paul P. v. Verniero*, 170 F.3d 396, 404, 405 (3d. Cir. 1999) (holding that sex offender registration did not infringe fundamental right of family relationships, and although the registration of offenders' home addresses invaded the fundamental right to privacy, the state had a compelling interest to prevent future sex offenses).

In evaluating the appropriateness of the legislative means to the ends sought, the court looks to the actual provisions of the statute itself, to determine to what extent they infringe upon allegedly protected rights. SORNA of 1999, as amended, provides the following information on the internet:

> 1) The registrant's name, date of birth and photograph;
> 2) The registrant's city or town of domicile and residence;
> 3) The registrant's place of employment and college or school being attended, if applicable, and the corresponding address and location; and
> 4) The statutory citation and name of the offense for which the registrant was convicted.

34-A M.R.S. §11221(9)(A) (2011). Upon written request containing the name and date of birth of a registrant, the following information is accessible:

> 1) The registrant's name, aliases, date of birth, sex, race, height, weight, eye color, mailing address and physical location of domicile and residence;
> 2) The registrant's place of employment and college or school being attended, if applicable, and the corresponding address and location;
> 3) A description of the offense for which the registrant was convicted, the date of conviction and the sentence imposed; and
> 4) The registrant's photograph.

34-A M.R.S. §11221(9)(B) (2011). The information that SORNA of 1999 makes public is therefore information intended to inform the public about the potential risk posed by the registrant and to allow the public the information necessary to recognize the registrant. The statute does not reveal information in which courts have recognized a potential privacy interest, such as financial or medical information. *Compare Borucki v. Ryan*, 827 F.2d 836, 840-49 (1st Cir. 1987) (reviewing cases and noting circuit split regarding right to privacy in psychiatric records) *with Cutshall v. Sundquist*, 193 F.3d 466, 480-81 (6th Cir. 1999) (rejecting a constitutional right to non-disclosure of private information).

The plaintiffs do not cite any authority for the proposition that disclosure of a matter of public record, the fact of their convictions, and of their identifying characteristics in order to render that status meaningful to the public, constitutes the infringement of a fundamental right. Moreover, in the context of sex offender registration laws, persuasive precedent exists suggesting that the disclosure of information sufficient for the public to identify a convicted sex offender does not implicate any fundamental right to privacy on the part of the registrant. *See A.A. v. New Jersey*, 341 F.3d 206, 211-13 (3rd Cir. 2003) ("this case begins with the understanding and, indeed, the requirement that what might otherwise be private information be made public . . . it is clear that a registrant's right to privacy in his or her home address gives way to the State's compelling interest to prevent sex offenses"); *see also Smith*, 538 U.S. at 101 (acknowledging the potential adverse effect of disclosure, but explaining that "consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record. The State makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take the precautions they deem necessary before dealing with the registrant . . ."). Even under a more protective constitutional interpretation than our own, that of the Illinois Constitution, the Supreme Court of Illinois found "that [a registrant]

does not have a cognizable privacy interest in his sex offender registry information." *People v. Cornelius*, 821 N.E.2d 288, 300 (2004). The court reasoned that the registrant "engaged in conduct that lowered the privacy bar as his acts spawned a criminal prosecution culminating in a public record that contains the challenged information," and "[a]ccordingly, [the registrant] cannot argue that the compilation and dissemination of truthful information that is already, albeit less conveniently, a matter of public record constitutes a legitimate privacy interest." *Id.* (quotations and citations omitted). Nor does a person have an expectation of privacy in a photograph of his or her face. *See United States v. Emmett*, 321 F.3d 669, 672 (6th Cir 2003) ("In addition, we think it clear that a person has no expectation of privacy in a photograph of his face. *See United States v. Doe*, 457 F.2d 895, 898 (2d Cir. 1972)("There is no 'reasonable expectation of privacy' about one's face.")").

Given the Supreme Court's warning against expanding the universe of federal "fundamental rights" and the absence of precedent supporting a registrant's right to privacy in his or her identifying information, as well as SORNA of 1999's limitation of disclosed information to that which members of the public would need in order to take precautions, the court concludes that the plaintiffs do not have a fundamental liberty interest in nondisclosure of their registry information.

Because the plaintiffs have not established that SORNA of 1999, as amended, infringes upon any recognized fundamental right or liberty interest, the legislative means employed will be considered appropriate to the achievement of the ends sought as long as they are reasonably related to a legitimate state interest. *See Aseptic Packaging*, 637 A.2d at 461; *Glucksberg*, 521 U.S. at 720-21. The interest of public safety is reasonably related to the statute's provisions making available information about convicted sex offenders in order that families and the public may take appropriate precautions. The second factor of the test therefore supports upholding the statute.

## 3. Manner of exercising police power

The third and final factor of the due process inquiry is whether the statute's implementation is arbitrary and capricious. "[A] court, in performing a rational-basis analysis, is not limited to the face of the statute and may go beyond its face in determining whether any *conceivable* state of facts exists to support a statute." *Aseptic Packaging*, 637 A.2d at 460. "It is for the legislature, not the courts, to judge the wisdom of legislative action and to evaluate

54

legislative facts." *Id.* "The State has no burden to come forward with such conceivable state of facts, but rather, it is the contestant who retains the burden of proving that no conceivable state of facts exists." *Id.* (quotations omitted). "When a statute does not implicate fundamental rights, we must ask whether it is rationally related to legitimate government interests. The rational basis standard is highly deferential and we hold legislative acts unconstitutional under a rational basis standard in only the most exceptional circumstances." *Doe v. Moore*, 410 F.3d at 1345 (quotations and citation omitted). "Almost every statute subject to the very deferential rational basis . . . standard is found to be constitutional." *Id.* at 1346-47.

The court agrees with other courts which have addressed this issue that "protecting the public from sexual abuse" by allowing the public to "use the registration to determine whether any sex offenders live in their neighborhood, make an individual assessment of the risk, and take any precautions appropriate under the circumstances" is a legitimate state interest, and that SORNA of 1999 bears a rational relationship to that interest. The plaintiffs have not met their burden of establishing an absence of facts that could support this statute.

Because the plaintiffs have not met their burden, their motion for summary judgment asserting that SORNA of 1999, as amended, should be overturned on substantive due process grounds is DENIED. The state defendants' motion for summary judgment is GRANTED.

## VIII. Cruel and unusual punishment

The Eighth Amendment to the Constitution of the United States provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article 1, Section 9 of the Maine Constitution similarly provides, "Sanguinary laws shall not be passed; all penalties and punishments shall be proportioned to the offense; excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted."

Because the court has determined that the registration requirements of SORNA of 1999, as amended, are not punitive as applied to persons sentenced after the statute's effective date, these constitutional provisions are not implicated. *See, e.g., Thun v. State of Maine*, 2009 U.S. Dist. LEXIS 66670 at *53 (D. Me. 2009) ("Thun has no viable Eighth Amendment challenge to his registration . . . requirements.") (citing *Cutshall v. Sundquist*, 193 F.3d 466, 477 (6th Cir. 1999) ("We have already concluded that the Act does not impose punishment; it is regulatory in nature. Therefore, it does not violate the Eighth Amendment's prohibition on cruel and unusual

punishment."); *Johnson v. Terhune*, 184 Fed. Appx. 622, 624 (9th Cir. 2006) ("Requiring appellant to register as a sex offender did not violate the Ex Post Facto Clause, Double Jeopardy Clause or Cruel and Unusual Punishment Clause because sex offender registration is not punishment.")); *see also Snyder v. State*, 912 P.2d 1127, 1131 (Wyo. 1996) ("Our determination that registration is not punishment is dispositive of Snyder's claim that it is cruel and unusual punishment . . . ."). The two state court cases the plaintiffs cites in favor of their proportionality argument, *People v. Dipiazza*, 778 N.W.2d 264 (Mich. App. 2009) and *People v. Carmony*, 26 Cal. Rptr. 3d 365 (Cal. Ct. App. 2005) therefore do not inform this court's analysis, since *Dipiazza's* "cruel and unusual punishment" analysis proceeded from its finding that the application of the sex offender registration requirements constituted punishment, 778 N.W.2d at 273[20]; and the *Carmony* court never addressed the issue of whether registration requirements constituted punishment[21] because it found that a prison term of twenty-five years to life, imposed under California's "Three Strikes" recidivism law, for failure to provide duplicate sex offender registration information was an unconstitutionally cruel and unusual sentence. *Carmony*, 26 Cal. Rptr. 3d at 369, 370.

Because registration does not constitute punishment, it cannot be cruel and unusual punishment.[22] The plaintiffs' motion for summary judgment on this ground is accordingly DENIED. The state defendants' motion for summary judgment is GRANTED.


## IX. Maine's Declaration of Rights

The plaintiffs acknowledge that they "have woven" the rights guaranteed by Article I, Section 1 of the Maine Constitution into their due process arguments, but nonetheless assert this provision as an independent basis for a finding that SORNA of 1999, as amended, is "unconstitutional because it violates these rights disproportionately and without proven efficacy or justification." (Memo. of Mitchell Firm Pls. at 32.)

---

[20] The court would also note that *Dipiazza*'s holding has subsequently been strongly limited by the Michigan Court of Appeals. *See State v. TD (In re TD)*, 2011 Mich. App. LEXIS 954 at *18 ("We note that the majority of the binding precedent holds that the SORA does not cause punishment, and the *Dipiazza* Court's holding to the contrary appears confined to the specific facts of that case.").

[21] And explicitly did not address the defendant's ex post facto claim, *Carmony*, 26 Cal. Rptr. 3d at 370 n.6.

[22] The court also analyzed the proportionality of the registration requirements in its determination that SORNA of 1999, as amended, did not constitute punishment, *see* II(7), *supra*.

"We have traditionally exercised great restraint when asked to interpret our state constitution to afford greater protections than those recognized under the federal constitution." *Bagley v. Raymond Sch. Dep't*, 1999 ME 60, ¶ 13, 728 A.2d 127, 132 (quoting *State v. Buzzell*, 617 A.2d 1016, 1018 n.4 (Me. 1992)). A review of recent state constitutional challenges brought by individual Maine citizens suggests that in many respects individual provisions guaranteed to all Maine citizens by the founders of our state have been interpreted extremely narrowly by the Law Court. Indeed, it might be argued that certain provisions of Maine's constitution have been rendered practical nullities as a result. Though it was difficult for this court to discern a consistent principle or principles at work in these decisions which would enable it to analyze Maine's Declaration of Rights to determine whether it provides unique protections to the plaintiffs in this case, it appears that the Law Court has looked both to the plain language of the constitutional provision and its location within the constitutional framework in determining whether Maine's Declaration of Rights provides greater or parallel protection to that available under the federal constitution.

For example, in *State v. Gilman*, 2010 ME 35, 993 A.2d 14, the Court looked to the plain language of Article I, Section 9 of the Maine Constitution as a primary reason to interpret Maine's provision as providing no greater protection than that afforded citizens under the Eighth Amendment to the United States Constitution. The Court noted, "The plain language of *section 9* requires that 'punishments shall be proportioned *to the offense,*'" while the provision "says nothing about the individual offender." *Gilman*, 2010 ME 35, ¶ 16, 993 A.2d at 20 (quoting Me. Const. art. I, § 9). Thus, despite the differences between the Maine and federal provisions, *see, e.g., Harmelin v. Michigan*, 501 U.S. 957, 985 (1991) ("We think it enough that those who framed and approved the Federal Constitution chose, for whatever reason, not to include within it the guarantee against disproportionate sentences that some State Constitutions contained."), and its recognition that "federal authority does not control our interpretation of our State Constitution," the Law Court analogized to federal jurisprudence, which "has not required an *individualized* determination that a mandatory punishment is appropriate except in death penalty cases." *Gilman*, 2010 ME 35, ¶18, 993 A.2d at 20-21. The Law Court thus effectively declined to interpret the Maine Declaration of Rights as providing greater protection than the federal constitution, without explicitly stating that the state and federal provisions barring cruel and unusual punishment were coextensive.

In *Letalien,* the majority noted that the wording of the federal and state ex post facto provisions was virtually the same, and then went on to consider where in the respective constitutions those provisions were located before determining that location of the provisions was essentially of no consequence: "The location of the federal and Maine ex post facto prohibitions within their respective constitutions is a function of history and the manner in which each constitution was developed, and does not establish that the Maine prohibition was intended to afford greater or different protection than the federal prohibition." *Letalien*, 2009 ME 130, ¶ 24, 985 A.2d at 14. Justice Silver pointed out in his concurring opinion, however, that

> The location of a provision within a constitution bears as much significance as the provision's text itself. Chief Justice Marshall recognized this point when construing the Necessary and Proper Clause in *McCulloch v. Maryland*, 17 U.S. 316, 419-20, 4 L. Ed. 579 (1819). Rebuffing Maryland's argument that the clause limited Congress's power to enact legislation, the Chief Justice deftly pointed to the clause's placement "among the powers of Congress, not among the limitations on those powers." *Id.* at 419. Had the framers intended "by this clause, to restrain the free use of means which might otherwise have been implied, that intention would have been *inserted in another place*." *Id.* at 420 (emphasis added).

*Id.* at ¶ 70, 985 A.2d at 28.

However, the Maine Constitution does retain individuality and vitality in one area. The Law Court over the last few decades has expanded protection for Maine citizens under the Maine Constitution in the area of voluntariness of confessions. Beginning with *State v. Collins,* 297 A.2d 620 (Me. 1972), the Maine Supreme Court recognized that federal constitutional authority "prescribed a mandatory *minimum* standard," and that "the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." *Collins*, 297 A.2d at 626 (quotations omitted). Ten years later, in *State v. Caouette,* 446 A.2d 1120 (Me. 1982), Justice Wathen explored "[t]he relationship between federal and state control," reiterating "that federal decisions do not serve to establish the complete statement of controlling law but rather to delineate a constitutional minimum or universal mandate for the federal control of every State" and that "the States are free, pursuant to their own law, to adopt a higher standard." *Caouette*, 446 A.2d at 1122 (quotations omitted). The *Caouette* court noted "that the privilege exists in this case by virtue of the Maine Constitution" and that the federal constitutional provisions provide "a limitation upon the federal government and [have] no direct reference to state action except to the extent incorporated as a requirement of due process under the Fourteenth Amendment." *Id.* Since the federal

constitutional provision provides only the minimum of permissible protections, "The maximum statement of the substantive content of the privilege and the requirements of [the constitutional provision] must be decided by this Court -- as a matter of Maine law." *Id.* The majority in *State v. Rees*, 2000 ME 55, 748 A.2d 976, upheld Maine's more stringent standard of proof for establishing the voluntariness of statements established in *Collins* and *Caouette*, even after the federal precedent had explicitly held otherwise, reasoning, "Although we may look to the construction of federal constitutional provisions in U.S. Supreme Court cases and apply the same construction as far as possible, we are not confined to that construction when, as in *Caouette*, a more protective standard is warranted under Maine law." *Rees*, 2000 ME 55, ¶ 9, 748 A.2d at 979. The dissent, authored by current Chief Justice Saufley, agreed with the majority's assertion "that it is free to provide broader protections than those provided under the federal constitution," but qualified that agreement: "the Court may not create concepts in the Maine Constitution that are not actually included within its terms." 2000 ME 55, ¶ 40, 748 A.2d at 988; *see also id.* at ¶ 30, 748 A.2d at 985.

Given the potential for the Law Court to find greater protection for the individual under the Maine Constitution than that which has been found in the Federal Constitution, the court returns to the questions left unanswered in *Doe v. District Attorney*, 2007 ME 139, 932 A.2d 552. There, Justice Caulkins, writing for the majority, found that *State v. Haskell*, 2001 ME 154, 784 A.2d 4, did not foreclose re-analysis of SORNA of 1999 under the *Mendoza-Martinez* intent-effects factors, *see Mendoza-Martinez*, 372 U.S. 144, and that such analysis was not foreclosed by the United States Supreme Court's decision in *Smith v. Doe*, 538 A.2d 84, 123 S. Ct. 1140 (2003). *Doe*, 2007 ME 139, ¶¶ 26, 35, 932 A.2d 560, 563. The Law Court majority in *Doe* concluded that, given the significant changes to SORNA between 2001, when it had decided *Haskell*, and 2007, re-analysis was appropriate, and remanded the case to this court for factual development. Although the majority did explicitly find, "We do not have cause to reconsider our equating the Ex Post Facto Clause in the Maine Constitution with the same clause in the United States Constitution," *id.* at ¶ 26 n.6, 932 A.2d at 560 n.6, it also appeared to be troubled by the difference between SORNA as applied to Haskell, and the version of SORNA of 1999 at issue in 2007, which did not contain the provisions for "for waiver from registration 'for good cause shown,' 34-A M.R.S.A. § 11121(6)(D) (Supp. 1999), and, after five years, upon a showing of 'a

reasonable likelihood that registration is no longer necessary and waiver . . . is appropriate.' 34-A M.R.S.A. § 11121(6)(C) (Supp. 1999)." *Doe*, 2007 ME 139, ¶ 35, 932 A.2d at 563.

> Doe would appear to have been a good candidate for the second waiver provision because, according to the complaint, he has been a productive citizen, a family man, and has no other arrests or convictions for sex offenses. Although the Supreme Court in *Smith v. Doe* was not troubled by the fact that the Alaska Act was not narrowly drawn, 538 U.S. at 102, *the fact that a sex offender never has the ability to escape the registration requirements of the current SORNA, regardless of behavior, consequences, or contributions following the conviction, strikes us as having the capability to be excessive* and as diverging from the purpose of protecting the public. Doe should be given the opportunity to develop the record and to prove, if he can, the excessiveness of SORNA in relationship to its stated goal of protecting the public from potentially dangerous registrants.

*Id.* (emphasis added).

Justices Alexander and Silver, concurring in the judgment, agreed that "review of the 1999 and subsequent amendments to the Sex Offender Registration and Notification Act (SORNA) . . . needs further development of the facts," but wrote separately to suggest that Maine's history, precedent, and Constitution would suggest a result different from that reached federally or in other states. *Id.* at ¶¶ 38-39, 932 A.2d at 563. Most significantly, these two justices took issue with the same alteration to SORNA of 1999 that had concerned the majority, the absence of a possibility for termination of registration requirements, but they found that it raised additional concerns in light of the unique construction of the Maine Constitution's Declaration of Rights:

> [T]he Maine Constitution's Declaration of Rights not only ensures the right of "enjoying and defending life and liberty, acquiring, possessing and protecting property," it also protects the right of "pursuing and obtaining safety and happiness." ME. CONST., art. I, § 1. This clause, which does not appear in the Federal Constitution, demonstrates our State's commitment to providing citizens, even those who have committed heinous acts, the possibility of a secure and content existence. For lifetime registrants, the SORNA takes away that possibility and the prospect of redemption.

*Id.* at ¶ 63, 932 A.2d at 570.

If the Law Court were to revisit this argument and find such a right exists under the Maine Constitution's Declaration of Rights, it would be in good company. New Jersey's constitution, like Maine's, provides, "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety

60

and happiness." N.J. Const., Art. I, Para. 1 (2011). New Jersey's highest court, balancing the protection of the public from sex offenders with the individual rights guaranteed by the constitution, noted:

> [Laws limiting the amount of notification information available on registrants based upon their likelihood to reoffend] do not represent the slightest departure from our State's or our country's fundamental belief that criminals, convicted and punished, have paid their debt to society and are not to be punished further. . . . The laws represent a conclusion by the Legislature that those convicted sex offenders who have successfully, or apparently successfully, been integrated into their communities, adjusted their lives so as to appear no more threatening than anyone else in the neighborhood, are entitled not to be disturbed simply because of that prior offense and conviction; but a conclusion as well, that the characteristics of some of them, and the statistical information concerning them, make it clear that despite such integration, reoffense is a realistic risk, and knowledge of their presence a realistic protection against it.

*Doe v. Poritz*, 662 A.2d 367, 372-73 (N.J. 1995). Thus, another state has given meaning to its constitutional provision by requiring individualized risk assessment in order to best balance public safety and individual rights and privileges. *See also, e.g., State v. Guidry*, 96 P.3d 242, 250 (Haw. 2004) (finding, under the Hawaii Constitution, "absent a meaningful opportunity for dispensation, the subjection of offenders, who have already served their criminal sentences, to lifetime requirements is beyond the scope of permissible regulation. Thus, we hold that requiring lifetime registration of all sex offenders without qualification, noncompliance with which is punishable by criminal penalties, implicates a liberty interest that cannot be curtailed absent procedural protections"); *cf. Poe v. Sex Offender Registry Bd.*, 926 N.E.2d 187, 195 n.10 (Mass. 2010) ("The [statutory amendment providing indigent sex offenders a statutory right to counsel in board classification hearings] followed several decisions of this court holding parts of the Sex Offender and Community Notification Act unconstitutional for failing to comport with due process requirements. Taken together, these decisions required the board to provide sex offenders with individualized, evidentiary hearings before requiring registration or assigning a final classification level.") (citing *Doe v. Attorney Gen.*, 715 N.E.2d 37, 40 (1999) (individualized hearing required for persons adjudicated delinquent or convicted under G. L. c. 265, § 23, before obligation to register as sex offender could be imposed); *Doe, Sex Offender Registry Bd. No. 972 v. Sex Offender Registry Bd.*, 697 N.E.2d 512, 516-17, 520 (1998) (classification hearing to be held before board, rather than Superior Court; board must show appropriateness of classification by preponderance of evidence and make specific findings

supporting classification); *Doe v. Attorney Gen.*, 686 N.E.2d 1007, 1012-14 (1997) (presumptive level one sex offender entitled to evidentiary hearing before registration requirement imposed and private information disclosed)). Other states have found protections for registering sex offenders under various provisions within their state constitutions as well. *See, e.g., Blakemore v. State*, 925 N.E.2d 759 (Ind. 2010) (ex post facto as to plea bargain); *Doe v. Alaska*, 189 P.3d 999 (Alas. 2008) (ex post facto).

The reasons supporting a finding of a right to an individualized determination, like the "opportunity to . . . be relieved of the duty as was permitted under" SORA of 1991 and SORNA of 1995, *Letalien*, 2009 ME 130, ¶ 62, 985 A.2d at 26, are numerous. The plaintiffs have made many of those arguments under the other headings of their memorandum, in areas of law where the court has been constrained by the coextensive nature of Maine and federal precedent, resulting in a narrowly defined analysis. The plaintiffs include several individuals who claim to have been rehabilitated and some of whom have gone years or decades without re-offense, some of whom pled guilty and waived their rights to a determination of their guilt without the idea that they would be subject to registration without the opportunity to establish rehabilitation and without the opportunity to rejoin their communities after having served their criminal sentences. This court would also note the obvious concern with the spectacle of aged, and even demented, registrants finding their way to the appropriate law enforcement agencies to comply with this law.

The court finds the plaintiffs' argument compelling in regards to Maine's Declaration of Rights. This unique state constitutional provision may require an individualized opportunity for lifetime sex offender registrants to prove their rehabilitation and achieve civic redemption, or to petition for termination of the registration requirements once an offender reaches a certain stage of life. However, given the challenges presented in analyzing coextensiveness, and the incomplete explication in recent decisions from the Law Court about this specific provision, this court declines to declare that such a right exists. The Law Court must determine if Justices Alexander and Silver were correct in their interpretation of this extraordinary provision in our state's constitution. *See Doe v. District Attorney*, 2007 ME 139, ¶¶ 42, 63-64, 932 A.2d at 564, 570.

The Law Court may indeed find that the language in Article 1 Section 1 is so extraordinary in its plain language (*Gilman*) and its location (*Letalien* (Silver, J., concurring)),

that such a right should be recognized, and that such a right is a concept not simply being "created" by the Court from terms not contained within the Maine Constitution (*Rees* (Saufley, J., dissenting)). This court declines, for reasons stated above, to recognize or define this right to strive toward rehabilitation and redemption, or one that might "provide the possibility of a secure and content existence." *But cf. In Re: Joseph v. Gardner,* 1987 Me. Super. LEXIS 233 at \*22-\*37 (finding, originating at the superior court level, that Maine's Declaration of Rights, "especially as contained in our 'Natural rights' enumerated in the very first section encompass[es] a person's right to make decisions effecting his person and life," including, ultimately, the right to end life-sustaining medical treatment).[23]

The Court therefore denies plaintiffs' motion for summary judgment under Article 1, Section 1 of the Maine Constitution, and grants State defendants' motion under this same state constitutional provision.

## X. Improper use of guilty plea

"[A] plea bargain is contractual in nature and is subject to contract-law standards." *United States v. Partida-Parra,* 859 F.2d 629, 633 (9th Cir. 1988) (quotation omitted); *see also State v. Murphy,* 2004 ME 118, ¶ 8, 861 A.2d 657, 661 ("Plea agreements are contracts and contract principles apply when interpreting them."). However, it is also true that a "voluntary and intelligent plea of guilty by an accused is a self-supplied conviction precluding trial of the issue of guilt or innocence and authorizing in and of itself the imposition of the punishment fixed by law. It is an efficient waiver of all defenses other than those jurisdictional in nature." *State v. Huntley,* 676 A.2d 501, 503 (Me. 1996) (quoting *Dow v. State,* 275 A.2d 815, 818 (Me. 1971)).

The plaintiffs agree that this argument is, in fact, a recasting of their ex post facto argument, in that they assert that expanding the consequences of a plea violates the plea agreements to the extent the expansion constitutes punishment. (Memo. of Mitchell Firm Pls.

---

[23] The privacy rights that the *Joseph* court found to sustain its decision regarding the right to die under the Maine Declaration of Rights do not affect this court's analysis that the plaintiffs here have no privacy right in the information that the registry makes publicly available through its website. While *Joseph*'s analysis of the right to privacy concerned autonomy over one's own body and stemmed from the authority of *Griswold v. Connecticut,* 381 U.S. 479, 484-485 (1965) and cases following it, the plaintiffs here have not offered any precedent to support their alleged right to privacy and counter the weight of authority upholding internet posting of a registrant's identifying information in the interest of public safety.

and Opp. to State Defs. Cross-Mot. for Summ. J. at 22.) The plaintiffs do not appear to argue for the opportunity to withdraw their pleas under a voluntariness analysis; indeed, withdrawal would not be a great advantage to them, as they have already served the sentence for the crime to which they have pled. *Cf. Price v. State*, 2010 ME 66, ¶¶ 14-16, 1 A.3d 426 (Alexander, J., concurring) ("The relief afforded a post-conviction petitioner who successfully challenges a conviction through a claim of inadequate advice about potential consequences of the conviction is to vacate the conviction, not to dismiss the charge. . . . With the conviction vacated, the underlying case returns to the active criminal trial docket, and the petitioner is placed in the same position he or she was in immediately before the plea proceeding. . . . If the petitioner is again convicted after either a trial or another plea, he or she is subject to a renewed sentence, but . . . [h]aving successfully attacked the conviction and the resulting sentence, the petitioner loses the benefit of any bargain with the prosecution or the court that led to the original conviction and sentence.").

"The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Laferriere v. State*, 1997 ME 169, ¶ 8, 697 A.2d 1301, 1305 (quotations omitted). "A plea is valid if it is made voluntarily with knowledge of the elements of the crime, the penalty that might be imposed and the constitutional rights relinquished by foregoing trial." *Id.* at ¶ 10, 697 A.2d at 1306 (quotations omitted). "There is no requirement under Rule 11 that the court inform the defendant of each and every *collateral* consequence of his plea and the resulting sentence." *Wellman v. State*, 588 A.2d 1178, 1181 (Me. 1991). Collateral consequences arising from a criminal conviction can be very burdensome indeed, ranging from an inability to secure certain employment or occupational licensing, to forfeiture of property, presumptions of jeopardy in child protective proceedings, or even deportation from the United States. *State v. Blakesley*, 2010 ME 19, ¶¶ 26-29, 989 A.2d 746, 753.

The court has ruled above that, despite the potentially significant burdens that the plaintiffs must endure under SORNA of 1999, as amended, the court cannot conclude that the statute is so punitive in effect as to overcome its intent as civil police power legislation. *Blakemore v. State*, 925 N.E.2d 759, 762-63 (Ind. App. 2010) does not affect this court's analysis, as the Indiana Constitution apparently offers greater protection than our own, which remains coextensive with the federal provision. *See Letalien*, 2009 ME 130, ¶ 63, 985 A.2d at

26. As it is not punitive, the registration obligation under SORNA of 1999 represents a collateral consequence, rather than a direct consequence, of the plaintiffs' pleas.

Because the plaintiffs' plea argument is dependent upon the ex post facto argument[24] wherein the court has determined that the retroactive application of SORNA of 1999, as amended, to the plaintiffs does not constitute punishment, the plaintiffs' motion for summary judgment on this ground is DENIED; the state defendants' motion on this ground is GRANTED.

## XI. Right to jury trial

The plaintiffs agree that if they are entitled to no hearing on dangerousness, then they are likewise not entitled a jury trial on the issue. (Reply Memo. of Mitchell Firm Pls. and Opp. to State Defs. Cross-Mot. for Summ. J. at 22.) As the court has analyzed the plaintiffs' procedural due process arguments before concluding that their arguments were foreclosed by *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003) and the structure of Maine's law and sex offender registry, no further analysis is necessary on this point. The plaintiffs' motion for summary judgment on the jury trial issue is DENIED; the state defendants motion for summary judgment on this point is GRANTED.

## XII. Violation of the MCRA

On October 30, 2009, this court dismissed the plaintiffs' counts pursuing damages under the Maine Civil Rights Act (MCRA), 5 M.R.S. §§4681 – 4685, and under 42 U.S.C. §1983 against the State defendants in their official capacities. The court ruled that the plaintiffs had failed to state a claim because neither the MCRA nor §1983 permits recovery of damages from an action against the State. The plaintiffs assert, however, that the order failed to address the equitable relief to which all the plaintiffs, including those who have been removed from the registry, are entitled, including the restitution for the fees and costs relating to registration (including travel to and from the registration or verification location, passport photos, and time

---

[24] Although the analysis was focused on the plaintiffs' ex post facto argument, the court notes that an argument potentially more compelling for a discrete and finite class of plaintiffs who pled guilty before a registry was even contemplated, is one of fundamental fairness under Maine's Declaration of Rights—a fairness and a right which this court has, above, acknowledged is for the Law Court alone to determine.

away from work) or to removal from the registry, which relief was not foreclosed by the court's order.

The state defendants counter that the plaintiffs have no right to recover, whether the recovery is deemed restitution or damages, against the State, and that qualified immunity or prosecutorial immunity would protect officers sued in their individual capacities. The state defendants advance a number of cases addressing the qualified immunity issue, despite the fact that the plaintiffs explicitly "seek their relief from the state defendants in their representative capacities, and in those capacities, they will not have to pay money out of their own pockets." (Reply Memo. of Mitchell Firm Pls. and Opp. to State Defs. Cross-Mot. for Summ. J. at 23.)

The MCRA provides a private right of action for breach of a constitutional right as follows:

> Whenever any person, whether or not acting under color of law, intentionally interferes or attempts to intentionally interfere by physical force or violence against a person, damage or destruction of property or trespass on property or by the threat of physical force or violence against a person, damage or destruction of property or trespass on property with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State or violates section 4684-B, the person whose exercise or enjoyment of these rights has been interfered with, or attempted to be interfered with, may institute and prosecute in that person's own name and on that person's own behalf a civil action for legal or equitable relief.

5 M.R.S. §4682(1-A) (2011). The statutory scheme also provides for recovery of attorneys' fees and costs: "In any civil action under this chapter, the court, in its discretion, may allow the prevailing party, other than the State, reasonable attorney's fees and costs, and the State shall be liable for attorney's fees and costs in the same manner as a private person." 5 M.R.S. §4683 (2011). 42 U.S.C. §1983 (2011) similarly provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the

District of Columbia shall be considered to be a statute of the District of Columbia.

Attorneys' fees are also potentially available for violations of §1983, as provided by 42 U.S.C. §1988(b):

> In any action or proceeding to enforce a provision of sections . . . [42 USCS §§ 1981-1983, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

The court has already ruled that the plaintiffs cannot recover damages under either statute. This court has previously thoroughly evaluated the possibility of obtaining financial relief from a state entity under §1983:

> [A] narrow exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities exists, where the award sought is prospective in nature. *See Papasan v. Allain, 478 U.S. 265, 278 (1986)*; *Green v. Mansour, 474 U.S. 64, 6869 (1985)*; *Dirrane v. Brookline Police Dep't, 315 F.3d 65, 71 (1st Cir. 2002)* ("Yet in the sovereign immunity context, the Supreme Court has repeatedly said that an official who acts unconstitutionally can be enjoined even though the state is immune from damages."); *Henrietta D. v. Bloomberg, 331 F.3d 261, 287 (2d Cir. 2003)* ("The Eleventh Amendment, however, does not preclude suits against state officers in their official capacity for prospective injunctive relief to prevent a continuing violation of federal law."). This exception appears to apply in the state sovereign immunity context.[25] *See, e.g., [Moody v. Comm'r, Dep't of Human Servs., 661 A.2d 156, at 158-159 (Me. 1995)]* (recognizing that where an award can "lead to no relief that is prospective, but only to monetary awards from the state treasury for past violations of federal law[,]" sovereign immunity applies); *Wellman v. Dep't of Human Servs., 574 A.2d 879, 884 n.11 (Me. 1990)* (precluding, on grounds of sovereign immunity, anything but prospective relief). The doctrine applies only against state officials sued in their official capacities, not against states or state agencies. *Larsen v. State Employees' Ret. Sys., 553 F. Supp. 2d 403, 412 (M.D. Pa. 2008)*.
>
> The United States Supreme Court has recognized that the difference between retrospective and prospective relief "will not in many instances be that between day and night." *Edelman [v. Jordan, 415 U.S. 651, 667 (1974)]*. The pivotal question is whether the relief "serves directly to bring an end to a present

---

[25] This analysis is distinct, since "the Eleventh Amendment does not apply in state courts." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 63-64 (1989) (quoting *Maine v. Thiboutot*, 448 U.S. 1, 9, n. 7 (1980)). "Although the Eleventh Amendment is not directly applicable to state courts, the doctrine of sovereign immunity similarly protects the states from actions [in] state courts." *Moody v. Comm'r, Dept. of Human Servs.*, 661 A.2d 156, 158 n.3 (Me. 1995).

> violation of federal law," by governing an officer's future conduct. *Whalen v. Mass. Trial Court,* 397 F.3d 19, 29 (1st Cir. 2005). If so, relief is not barred "even though accompanied by a substantial ancillary effect on the state treasury." *Papasan,* 478 U.S. at 278. However, relief that is "tantamount to an award of damages for a past violation of . . . law, even though styled as something else," is barred by sovereign immunity. *Id.*

*Olfene v. Bd. of Trs., Maine Pub. Employees' Ret. Sys.,* 2008 Me. Super. LEXIS 214, at *14-*16. *See also Wyman v. Sec'y of State,* 625 A.2d 307, 310 (Me. 1993) ("Although claims for damages against states or state officials acting in their official capacity are not authorized by section 1983, *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989) (states are not 'persons' for purposes of section 1983), claims for injunctive and ancillary relief pursuant to section 1983 and section 1988 may be maintained against state officials acting in their official capacity.") (quoting *Will,* 491 U.S. at 71 n.10; *Lett v. Magnant,* 965 F.2d 251, 255 (7th Cir. 1992); *Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1519 n.1 (10th Cir. 1992)). In *Hutto v. Finney,* 437 U.S. 678 (1978), the Supreme Court explored the boundaries of what would constitute prospective relief in terms of a monetary award. The Court awarded attorneys' fees as an enforcement ancillary to prospective relief (*id.* at 691-92), and also awarded costs, reasoning:

> Unlike ordinary "retroactive" relief such as damages or restitution, an award of costs does not compensate the plaintiff for the injury that first brought him into court. Instead, the award reimburses him for a portion of the expenses he incurred in seeking prospective relief. (An award of costs will almost invariably be incidental to an award of prospective relief, for costs are generally awarded only to prevailing parties, see *Fed. Rule Civ. Proc. 54 (d)*, and only prospective relief can be successfully pursued by an individual in a suit against a State.)

*Id.* at 695 n.24.

The court is thus clearly limited to awarding prospective relief, "serv[ing] directly to bring an end to a present violation of federal law," by governing an officer's future conduct, and only if the restitution the plaintiffs seek is ancillary to that relief will it be approved, since "[r]elief that is 'tantamount to an award of damages for a past violation of federal law, even though styled as something else,' is barred." *Whalen,* 397 F.3d at 29 (quoting *Papasan,* 478 U.S. at 278 (1986). The plaintiffs have not articulated any prospective relief to which they are entitled, any action that this court should take to "bring an end to a present violation of federal law." Instead, their action appears to seek compensation for a past violation. They ask the court to rule that SORNA of 1999—at the time of *Letalien,* prior to the Chapter 570 amendments—

was an unconstitutional law, and this purported declaratory judgment is the prospective relief to which their restitution claims are ancillary. The court does not see a prospective remedy in the plaintiffs' requests. They request an award "tantamount to an award of damages for a past violation of federal law," which the court cannot grant. Because the analysis under the MCRA is equivalent to the analysis under §1983, *see Jenness v. Nickerson*, 637 A.2d 1152, 1158 (1994), the plaintiffs' motions for summary judgment under both the MCRA and the §1983 counts are DENIED, and the state defendants' motions for summary judgment on both counts are GRANTED.

## CONCLUSION

The court recognizes that there is much at stake for both the plaintiffs and defendants in this matter. The history of SORNA in Maine is one in which all branches of government have acted in an attempt to find constitutional ways to protect the public, especially children, from sex offenders. Clearly, the State of Maine has significant and legitimate reasons in monitoring the whereabouts and activities of sex offenders who reside throughout Maine. At the same time, the plaintiffs understandably argue that traditional notions of rehabilitation and civic redemption should be available to them at some point after they complete their sentences, particularly if they have gone on to become productive and law-abiding members of the community. Most of the plaintiffs in this matter were convicted in the 1980s. They served their sentences, then, decades later, suddenly came into unanticipated and onerous consequences from that conviction. The sting of injustice felt by those registrants is understandable, even more than for *Letalien* and his compatriots, who at least knew that registration would be a consequence of their convictions. However, in the absence of a finding of retroactive punitiveness or other specific constitutional violation, a regulation made for the public good under the legislature's police power must be upheld. The court owes the legislature that deference under the balance of powers. *See State v. Haskell*, 2008 ME 82, ¶ 5, 955 A.2d 737, 739 ("Great deference is given to social and economic regulations, and reasonableness is presumed because it is the job of the Legislature, not the courts, to balance competing interests.").

The plaintiffs' motion for summary judgment is DENIED as to all counts.

The state defendants' motion for summary judgment is GRANTED as to all counts.

This Order shall be noted on the Docket as incorporated by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

8/18/11
_____
DATE

_____
SUPERIOR COURT JUSTICE

70

STATE OF MAINE
KENNEBEC, ss

JOHN DOE et al.

v.

COL. ROBERT WILLIAMS, et al.[1]
    In his capacity as
    Chief of Maine State Police

SUPERIOR COURT
CV-06-113

**ORDER ON PLAINTIFFS'
MOTION FOR
ATTORNEY'S FEES**

Before the Court is a motion for award of counsel fees brought by the Mitchell Firm on behalf of John Does I, III, IV, V, VI, VII, X, XIII, XVI, XVIII, XXIV and XLIII. At the time the motion was filed, the plaintiffs could not know that this court would grant the state defendants' motion for summary judgment on all counts, as the Court had ordered the parties to brief all issues, including the issue of fees, simultaneously. The plaintiffs therefore argue this motion in the alternative. They claim that even if they do not prevail on their cross-motion for summary judgment, they should nonetheless receive an attorney's fee award under the so-called "catalyst" theory. In addition, the plaintiffs claim that four of them (John Does VII, XIII, XVIII and XXIV), who received the benefit of temporary restraining orders which kept them off the registry, and who were subsequently eligible under post-*Letalien*[2] SORNA amendments to be free of registration obligations, fundamentally altered their relationship with the defendants as a result of this litigation, entitling them to an award.

On August 18, 2011, this court granted the defendants' motion for summary judgment and denied the plaintiffs' cross-motion for summary judgment. The court has now considered the parties' filings on the counsel fee issues along with all attachments. The court has reviewed the history of the case, and issues the following findings and order.

"The court's authority to award attorney fees may be determined by statute, by the 'American Rule' at common law that generally prohibits taxing the losing party in litigation with a successful opponent's attorney fees, or by certain recognized common law authorizations of

---

[1] Colonel Patrick Fleming was the original named defendant, but Colonel Robert Williams has succeeded him in the post of Chief of the State Police. As the party is a defendant in his official, rather than individual, capacity, the court has made the substitution after receiving the new information from the state defendants.

[2] *State v. Letalien*, 2009 ME 130, 985 A.2d 4.

1

attorney fees." *Cimenian v. Lumb*, 2008 ME 107, ¶ 11, 951 A.2d 817, 820 (quoting *Linscott v. Foy*, 1998 ME 206, ¶ 16, 716 A.2d 1017, 1021). Because "Maine follows the American rule that litigants bear their own attorney fees in the absence of statutory authority or a contractual provision," *Soley v. Karll*, 2004 ME 89, ¶ 10, 853 A.2d 755, 758, the plaintiffs assert their entitlement to attorneys' fees under three separate theories: (1) 42 U.S.C. § 1988 justifies an award related to 42 U.S.C. §1983; (2) the Maine Civil Rights Act, 5 M.R.S. §§ 4681-4685, supports an award; and (3) certain plaintiffs are entitled to an award because of the vexatious manner in which the state defendants have reacted to the reversal of state law. The state defendants oppose all three of the plaintiffs' proposed grounds for an award of attorney's fees.

At the outset, the court would note that both parties take aim at the other side, criticizing each other's conduct, motives and even skills. Because the current state of Maine law on the issue of what it means to establish "prevailing party" status dictates the court's decision on this motion, the court does not feel obligated to make extensive factual findings about what occurred during the litigation. However, the court is compelled to make findings with respect to certain claims made by both sides in their filings on this motion.

First, the defendants claim that the plaintiffs argued "the wrong issue," by declining to argue ex post facto in *Doe v. Fowle*, 2006 Me. Super. LEXIS 241, which, on appeal, became *Doe v. District Attorney*, 2007 ME 139, 932 A.2d 552, an assertion with which this court and the Law Court would disagree. The plaintiffs in *Doe v. District Attorney* would certainly have been tilting at windmills if they had ignored the Law Court's holding in *State v. Haskell*, 2001 ME 154, 784 A.2d 4, and the United States Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84 (2003). The plaintiffs, however, appropriately pled causes of action in this matter which allowed them to live to fight another day, notwithstanding those two decisions.

In addition, while this court shared the misgivings it had with all the parties about the propriety or wisdom of making individualized findings as part of the *ex post facto* analysis, at the time that discovery was being conducted in this case, the prevailing precedent was one in which the Law Court had very clearly remanded the case before it to the Superior Court for factual development. Thus, individualized factual development was not an approach that the plaintiffs demanded; it was an approach required by the Law Court's holding in *Doe v. District Attorney*, 2007 ME 139, 932 A.2d 552, and it would have been irresponsible of this court to ignore such a plain directive. The court would note that both Judge Stanfill and Justice Fritszche also must

2

have believed such individualized findings were required in the wake of *Doe v. District Attorney* as well, since that is the approach they took in their decisions in *State v. Letalien*[3] and *State v. A.L.,* 2008 Me. Super LEXIS 164. Therefore, to the extent state resources were expended and attorneys' fees incurred by the plaintiffs, it must be remembered that the discovery process was ordered and overseen by this court in order to comply with the Law Court's remand order. The court would finally note that the Law Court rejected the state defendants' attempt to stay this litigation (including discovery) despite, as the state defendants point out, their arguments regarding the fiscal impact of the litigation while all were awaiting the Law Court's decision in *Letalien.* (State Defs.' Memo. in Opposition to Pls. Fee Pet'n 4.)

The court would, however, similarly disagree with the plaintiffs' third argument in favor of an award of attorney's fees, namely, that they are entitled to attorney's fees because of the "contemptuous, vexatious or obstreperous conduct" of the state defendants, specifically the Office of the Attorney General. While the court cannot make findings as to what occurred at the Legislature in terms of the impact of the Attorney General's advice, it is clear that the final result of the Legislative amendments in *Letalien's* wake was beyond the control of the Attorney General. The Legislature may well have heeded what one would expect to be the advice from the Attorney General regarding issues of public safety, and their interpretation of *Letalien* and federal law regarding sex offender registries. However, that advice and the legislative response to it are both well within the prerogatives of both those branches of Maine government. Finally, it cannot be overlooked that the lack of provision in the amendments for individualized "due process hearings" was apparently the result of the legislature's acceding to fiscal concerns expressed by the judicial branch – or that the fiscal note was the sole and exclusive rationale for the Legislature's decision to exclude those hearings. *See* L.D. 1822, Summary (124th Legis. 2010)). The Legislature, after considering the position of the Attorney General, would have provided for hearings which might well have resulted in most, if not all, of the remaining John Does being free from SORNA requirements soon, or in the foreseeable future. The plaintiffs cannot ignore this clear and somewhat extraordinary statement from the Legislature as to why

---

[3] While the court's review did not turn up the full text of the district court order on Lexis, Judge Stanfill's careful fact-based analysis was recognized by the Law Court in its review of his order: "The District Court . . . issued comprehensive factual findings that detailed the negative effects that sex offender registration and Internet posting have had on Letalien's ability to obtain and maintain employment, his role as a husband and parent, and his standing in the community." *Letalien,* 2009 ME 130, ¶ 14, 985 A.2d at 11.

the plaintiffs do not have, under these amendments, a chance to make individualized arguments as to why they are deserving of this relief.

Having addressed the plaintiffs' third argument in favor of an attorney's fee award, the court now turns to the plaintiffs' arguments under 42 U.S.C. § 1988 and the MCRA. The pertinent provisions authorizing attorney's fees are as follows. 42 U.S.C. §1988(b) (2011) provides: "In any action or proceeding to enforce a provision of . . . 42 USCS §§ 1981-1983 . . . the court, in its discretion, may allow the *prevailing party*, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. §1988(b) (2011) (emphasis added). The state analogue under the MCRA likewise provides: "In any civil action under this chapter, the court, in its discretion, may allow the *prevailing party*, other than the State, reasonable attorney's fees and costs, and the State shall be liable for attorney's fees and costs in the same manner as a private person." 5 M.R.S. § 4683 (2011) (emphasis added).

The analysis thus turns on what it means to be a "prevailing party." The plaintiffs appear to argue that, even if they did not prevail on the summary judgment motions, the could nonetheless be entitled to an award of counsel fees if the court adopts as a matter of Maine law what is known in federal law as the "catalyst" theory; or if the court finds that the four John Does who ended up never having to be on the registry are found to have sufficiently altered their relationship with the defendants as a result of the temporary restraining orders. The court will address the arguments in turn.

The "'catalyst theory' . . . posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 601 (2001). The plaintiffs argue that the catalyst theory could retain its vitality in Maine, and that it is applicable to them because the litigation beginning with John Doe I, culminating in *Doe v. District Attorney*, 2007 ME 139, 932 A.2d 552, provided a basis for the *Letalien* appellate argument, which prevailed, and which resulted in the legislative enactment of Chapter 570. This logic is too attenuated to support an award of attorney's fees under current federal law.

Prior to *Buckhannon*, certain Circuit Courts of Appeal, including the First Circuit, *see, e.g., Paris v. United States Dep't of Hous. & Urban Dev.*, 988 F.2d 236, 238 (1st Cir. 1993) (explaining that to obtain an award of attorney's fees, "[t]he party either must enjoy bottom-line success in the litigation or act as a catalyst in causing the desired alteration"), had recognized the

4

catalyst theory. Under the theory, if a party sued a state over a law claimed to be illegal, and the state changed the law as a result of the suit, the party could claim that he or she had "prevailed" and receive an award for counsel fees. The Supreme Court in *Buckhannon* granted certiorari "to resolve the disagreement among the Courts of Appeals" and held that the "'catalyst theory' is not a permissible basis for the award of attorney's fees under the FHAA, 42 U.S.C. § 3613(c)(2), and ADA, 42 U.S.C. § 12205." *Buckhannon*, 532 U.S. at 610. "The Supreme Court's reasoning in *Buckhannon* is presumed to apply generally to all fee-shifting statutes that use the prevailing party terminology." *Aronov v. Neopolitano*, 562 F.3d 84, 89 (1st Cir. 2009) (quoting *Smith v. Fitchburg Pub. Sch.*, 401 F.3d 16, 22 n.8 (1st Cir. 2005)). After *Buckhannon*, "[t]o be a prevailing party, a party must show both a material alteration of the legal relationship of the parties, and a judicial imprimatur on the change." *Id.* (quotations and citations omitted).

"The *Buckhannon* Court went on to state that a 'defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur.'" *Smith v. Fitchburg Pub. Sch.*, 401 F.3d 16, 22 (1st Cir. 2005) (quoting *Buckhannon*, 532 U.S. at 605) (emphasis omitted). "A 'material alteration' exists when a party receives 'at least some relief on the merits of his claim.'" *Bangs v. Town of Wells*, 2003 ME 129, ¶ 9, 834 A.2d 955, 958-59 (quoting *Buckhannon*, 532 U.S. at 603-04.)

While the *Letalien* plaintiffs could assert the necessary judicial imprimatur upon and material alteration to the parties' legal relationship, the plaintiffs cannot.[4] This court's order on the merits of the parties' cross-motions for summary judgment, while recognizing the plaintiffs' sympathetic position as individuals subjected to an intrusive regulatory scheme whose existence was not even contemplated at the time of their convictions, was unable to award the plaintiffs any substantive relief, and granted the state defendants' motion for summary judgment. Therefore, the plaintiffs are not prevailing parties, and accordingly are not entitled to attorney's fees under 42 U.S.C. § 1988. *Cf. Bangs*, 2003 ME 129, ¶ 9, 834 A.2d at 958 ("If a judgment is

---

[4] Under federal law, the most analogous case would appear to predate *Buckhannon*. In *Hewitt v. Helms*, 482 U.S. 755, 759-60 (1987), the United States Supreme Court engaged in the following analysis:

> In order to be eligible for attorney's fees under β 1988, a litigant must be a "prevailing party." Whatever the outer boundaries of that term may be, Helms does not fit within them. Respect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail. See *Hanrahan v. Hampton, 446 U.S. 754, 757 (1980)*. Helms obtained no relief. Because of the defendants' official immunity he received no damages award. No injunction or declaratory judgment was entered in his favor. Nor did Helms obtain relief without benefit of a formal judgment -- for example, through a consent decree or settlement. See *Maher v. Gagne, 448 U.S. 122, 129 (1980)*.

entered against the complainant on the § 1983 claim, the complainant is not entitled to fees even if successful on other grounds.")

The parties agree that Maine's Law Court has never explicitly endorsed the catalyst theory, *but see Wyman v. Skowhegan*, 464 A.2d 181, 184 (1983) (". . . the lawsuit was a material factor in improving the plaintiffs' position; that is, the lawsuit acted as a 'catalyst' in prompting the defendants to take action to meet the plaintiffs' claims"), and has not explicitly addressed the effect of *Buckhannon* on attorney's fee awards under the MCRA. Under the Maine Human Rights Act, however, the Law Court has explicitly stated that Maine state courts follow federal law. *Maine Human Rights Comm'n v. Allen,* 474 A.2d 853, 857-58 (Me. 1987). The plaintiffs rightfully point out that their claims were brought under the Maine Civil Rights Act rather than the Maine Human Rights Act, but the defendants highlight that the Maine Legislature made it clear in its Statement of Fact to the 1989 amendments to the Maine Civil Rights Act that the Civil Rights Act "follows the Maine Human Rights Act" in regards to awarding counsel fees. *Comm. Amendment A to L.D. 1253, S-236 (114th Legislature 1989).*

The state of Maine law in this area was just summarized by the federal district court within the past year. *See Thayer v. E. Me. Med. Ctr., 740 F. Supp. 2d 191,* (D. Me. 2010). The court first noted, "In [*Maine Human Rights Commission v. Allen,* 474 A.2d 853, 858 (Me. 1984)], the Law Court held that a party should receive a fee-shifting award, so long as prevailing party status is shown." *Thayer,* 740 F.Supp.2d at 203.

> As for the standard to govern such awards, the Law Court pointed to the test stated in *Wyman v. Inhabitants of the Town of Skowhegan,* 464 A.2d 181, 183 (Me. 1983), where the Law Court adopted a standard enunciated by the First Circuit in *Nadeau v. Helgemoe,* 581 F.2d 275, 279-81 (1st Cir. 1978). That standard was designed to address prevailing party status when litigation is resolved by means of a consent decree, but the standard is not dissimilar to the standard applied when litigation concludes by judgment on a jury verdict: the litigation must have compelled a material alteration in the parties' legal relationship for the benefit of the plaintiff. *Wyman,* 464 A.2d at 183-84. A plaintiff need not win on all issues to meet this standard, but a significant issue must be resolved so that the plaintiff achieves some of the benefit sought through litigation. *Id.* at 184. Since *Wyman,* the Supreme Court has held that a party who obtains a nominal damages award is a prevailing party for purposes of civil rights litigation under Section 1988. *Farrar v. Hobby,* 506 U.S. 103, 112, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992).

6

*Id.* Thus, even under Maine precedent, a "significant issue must be resolved so that the plaintiff achieves some of the benefit sought through litigation."[5] *Id.* The plaintiffs have not triumphed in the judicial arena. In the absence of any state case holding or intimating that the Law Court is willing to diverge from federal law in any fee-shifting context, the court concludes that *Buckhannon's* categorical rejection of the catalyst theory should be followed here.[6]

The plaintiffs also assert that the temporary restraining orders obtained by John Does VII, XIII, XVIII and XXIV constitute sufficient judicial resolution in their favor to result in their being "prevailing parties" for the purposes of an award of attorney's fees. Specifically, they argue that post-*Buckhannon* courts have awarded counsel fees based upon the issuance of a temporary injunctive relief where the relief has done "more than preserve the status quo." (Mitchell Pls.' Memo. in Support of Motion for Attorney's Fees 10.). However, that was neither the intent nor the effect of the temporary restraining orders issued in this case.

In granting limited temporary relief for a number of the John Does, the court took pains to indicate that its intent was simply to preserve the status quo of each John Doe either while awaiting the Law Court's decision in *Letalien,* or for the duration of this litigation, as the defendants point out in their opposition to the motion for fees. In issuing the orders for John Does VII, XIII, XVIII and XXIV, this court, along with the Lewiston District Court and the York County Superior Court, focused on the issue of internet registration in its analysis. That focus turned out to be misplaced, given the Law Court's decision in *Letalien.* The court would note further that in the only temporary restraining order considered after *Letalien*, in the case of John Doe XLIII, the court refined the analysis used in the prior orders, and denied without prejudice the request for temporary restraining order. The court did, however, provide the same relief for John Doe XLIII as it did for the other John Does until the parties could fully argue their positions regarding language in *Letalien* that each claimed to support their positions under ex post facto

---

[5] The court further notes that it is not clear that the plaintiffs would prevail even should the Maine Law Court, like Vermont's Supreme Court, temporarily assume the continuing vitality of the catalyst theory. *See, e.g., Merriam v. AIG Claims Servs., Inc.,* 945 A.2d 882, 886-87 (Vt. 2008) (finding that plaintiff had not shown "that that her enforcement action was a necessary and important factor in causing defendant's payment of the amounts due" as required by the catalyst theory [quotations omitted], and citing *Buckhannon, 532 U.S. at 605-06* ("[W]e have not awarded attorney's fees where the plaintiff has secured the reversal of a directed verdict, or acquired a judicial pronouncement that the defendant has violated the Constitution unaccompanied by *judicial relief*.")).

[6] Plaintiffs suggest that *Bangs v. Town of Wells,* 2003 ME 1129, 834 A.2d 955 supports their position that this court should give *Buckhannon* a more expansive reading than the state's position would support. While *Bangs* was decided after *Buckhannon,* and refers in passing to the "generous" federal view on fee-shifting, *Id.* at 958, the court disagrees that it stands for the proposition that the Law Court was somehow endorsing the catalyst theory.

and other constitutional claims regarding lifetime registration requirements. (*See* Aug. 18, 2010 Order on Mot. for Temporary Restraining Order.)

The court therefore fundamentally disagrees with the plaintiffs' reading of the temporary restraining orders issued. The relief provided was never intended to do anything more than preserve the status quo. The plaintiffs themselves distinguish between cases where the preliminary relief merely preserved the status quo and those where a plaintiff became a prevailing party because the preliminary relief granted did more than preserve the status quo. *Compare, e.g., John T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 558-59 (3rd.Cir. 2003) (finding a preliminary injunction "designed to maintain the status quo during the course of proceedings" insufficient to "serve as the basis for conferring prevailing party status") (quotations omitted) *with, e.g., Maine Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 15 (1st Cir. 2003) (comparing cases and concluding, "interlocutory orders that confer substantive injunctive relief often have been viewed as sufficient to carry the weight of a fee award").

Because this court's temporary restraining orders were never intended to be and were not a determination of the merits of the plaintiffs' claims, and because by their terms they served to preserve the status quo, they are not grounds for conferring prevailing party status upon the plaintiffs.

The entry will be: Plaintiffs' Motion for Attorneys' Fees is denied. This order shall be noted on the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

_8 / 18 / 11_
**DATE**

_[signature]_
**SUPERIOR COURT JUSTICE**

8